## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), as an organization and representative of
its members; and HAITIAN-AMERICAN
GRASSROOTS COALITION, as an organization
and representative of its members,

Civil No. 4:O7cv4O2 spm/wcs

        Plaintiffs,

vs.

KURT S. BROWNING, in his official capacity as
Secretary of State for the State of Florida,

        Defendant.

## COMPLAINT

Plaintiffs, by their attorneys, Greenberg Traurig, P.A.; Paul, Weiss, Rifkind,

Wharton & Garrison LLP; the Brennan Center for Justice at NYU School of Law; the

Advancement Project; and Brian W. Mellor, as and for their Complaint against

Defendant, allege as follows:

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA
GAINESVILLE. FLA.

2007 SEP 19 AM 9: 56

1(-1(-13

RECEIVE GREENBERG TRAURIG, P.A.

## INTRODUCTION

1.     This is an action to strike down a provision of Florida election law that creates an illegal precondition to registering the State's voters and that will unlawfully disenfranchise thousands of Florida citizens in the 2008 election cycle.

2.     This provision, Section 97.053(6), Florida Statutes ("Subsection 6"), prohibits the Secretary of State from completing the registration of perfectly eligible voters if the State cannot match or verify the identifying information on the voters' registration applications with existing driver's license or Social Security records. Applicants who are not "matched" will not be allowed to cast a valid ballot unless they overcome a series of burdensome bureaucratic hurdles that deprive them of their fundamental right to vote. Some will not have a chance to overcome those hurdles and will just be denied the right to vote.

3.     This statutory obstacle to registration and voting will illegally disenfranchise thousands of eligible Florida voters during the 2008 election cycle. Matching information from one database with information in a different database is a process plagued with errors and is notoriously unreliable in the elections context. If not enjoined, Florida's matching system will exclude eligible voters from the registration rolls because of data entry errors, typos, meaningless spelling differences, imperfect handwriting, ministerial mistakes, computer glitches, and other factors having nothing to do with the voters' eligibility.

4.     There are a multitude of ways in which the records of eligible voters, who submit truthful and accurate registration applications, will fail to "match." For example,

2

voters who register in their married names will not match if their driver's license or Social Security records are in their maiden names. Voters with compound last names (*e.g.*, Gabriel Garcia Márquez) will not match if one database assigns part of the last name to a middle name position, but the other does not. And if a county computer operator reverses two digits in a driver's license number, the voter's records will not match.

5.      Eligible voters also will fail to match if they make trivial and immaterial mistakes on their registration applications that would not otherwise preclude them from voting. Florida's driver's license numbers, for example, are at least 13 digits long. If a voter unwittingly reverses two digits in her driver's license number on her application, her records will not match. Worse still, since the errant number on the application cannot later be "verified" by election officials, the eligible voter will not be registered and will not be allowed to vote — all because she flipped two digits in her driver's license number.

6.      This elevation of forms over substance is certain to violate the right to vote in Florida. In 2006, more than 20,000 voters found their applications unduly delayed or denied due to problems with the "matching" process.

7.      In the two years leading up to the 2004 Presidential Election, Florida processed more than twice the number of registrations than it processed in 2005 and 2006, and the volume of new registrations is again expected to swell to several million new forms in 2008. Other jurisdictions using similar "matching" processes have

3

experienced error rates between 15 and 30 percent — and, in some cases, even higher. If Subsection 6 is allowed to stand, it is likely that thousands of Floridians will be disenfranchised in 2008.

8.      This disenfranchisement-by-bureaucracy violates the very federal law that prompted Florida to adopt Subsection 6, the Help America Vote Act of 2002 ("HAVA"). Congress passed HAVA in the wake of the tumultuous 2000 Presidential Election to eliminate barriers to voting, not to erect new ones.

9.      HAVA mandates that each state create a computerized voter registration list for the entire state to use in all federal elections. HAVA also requires the states to assign a unique identifying number to each registrant on this computerized list. For that purpose, new registrants are asked to provide their driver's license number or the last four digits of their Social Security number. To ensure that the number is truly "unique" to each registrant, HAVA directs the states to check the identifying number against existing government databases. If the registrant has no existing number, the state simply assigns a unique number.

10.     Florida is in a small minority of states that have misconstrued this ministerial list-making assignment and turned it into an unlawful prerequisite to voter registration. Washington State's similar matching prerequisite was declared unlawful and its enforcement was enjoined last year. *See Wash. Ass'n of Churches* v. *Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006). A consent decree and final judgment permanently enjoining Washington State from enforcing the law was entered earlier this year. *Id.*,

4

*Stipulated Final Order and Judgment* (Mar. 16, 2007). As HAVA intended, and as in the vast majority of states, the Judgment provides that eligible voters whose application information cannot be matched will be placed on Washington's list of registered voters.

11.     Like Washington State's invalidated statute, Subsection 6 transforms the matching and verification of a record keeping number into a precondition to registration and voting. It therefore also violates and undermines HAVA, as well as voters' rights protected by the Voting Rights Act, the National Voter Registration Act, and the First and Fourteenth Amendments to the United States Constitution.

12.     Plaintiffs in this action are (1) organizations whose members include eligible but unregistered Florida voters who will attempt to register to vote prior to the registration deadline for the January 29, 2008 presidential preference primary election, the August 26, 2008 federal primary election, or the November 4, 2008 federal general election, but will be omitted from the official list of registered voters and, therefore, will be unable to cast a ballot that will be counted; and (2) organizations that seek to register voters and to reduce barriers to voter registration in Florida, especially for low-income voters or voters from certain ethnic communities, whose resources will be diverted and whose missions will be frustrated by Subsection 6.

13.     Plaintiffs seek a declaratory judgment, a preliminary injunction and a permanent injunction that will take effect by December 31, 2007, the registration deadline for the upcoming presidential preference primary election, prohibiting the Secretary of State from implementing Subsection 6, and directing that — as in 2004 and

5

before — supervisors be allowed to accept otherwise eligible applicants as registered even if an administrative identifying number cannot be verified.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; under 28 U.S.C. § 1343(a)(4), as a case seeking equitable and other relief pursuant to an act of Congress providing for the protection of the right to vote; and under 42 U.S.C. § 1983, as a case seeking to enforce rights and privileges secured by the laws of the United States.

15.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201(a) and 2202.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant resides in this district and a substantial part of the events or omissions giving rise to the claim have occurred or will occur in this district.

## PARTIES

17.    Plaintiff Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP") is the umbrella organization for the 60 Florida branches of the NAACP, the national civil rights organization. It maintains an office at 397 W. Church Street, Orlando, Florida 32801. The Florida NAACP's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination. To that end, and to encourage civic and electoral participation of traditionally underrepresented groups, the Florida NAACP engages in voter registration activities and public policy education and

6

advocacy related to education, health, housing, economic development, and criminal justice. The Florida NAACP coordinates the activities of the 60 NAACP branches and approximately 13,000 NAACP members throughout Florida, including their continuous efforts to register eligible voters, which will continue throughout 2008. Some NAACP members, and some of the citizens who will be recruited as new members, will be eligible to register and vote, and will want to register and vote in the 2008 election cycle, but will be unduly delayed or denied in registering because of Subsection 6. Subsection 6 will also force the Florida NAACP to divert resources to resolving registration problems encountered by citizens it registers, and will frustrate a core part of the Florida NAACP's mission by interfering with its ability to ensure that eligible Florida citizens can register and vote.

18.     Plaintiff Haitian-American Grassroots Coalition ("HAGC") is an umbrella organization made up of approximately 700 members and 15 predominantly Miami-based organizations serving the Haitian American community, which work together on issues of common      concern,      especially      those      addressing      low-income      and      otherwise underrepresented populations in Florida, including Haitian Americans. HAGC maintains an office at 4584 NE 2nd Avenue in Miami, Florida. HAGC engages in public policy advocacy and education and encourages citizen participation in public affairs by encouraging voting and conducting poll monitoring to ensure that their targeted populations, including Haitian Americans, can meaningfully participate in elections. It is critical to HAGC's advocacy efforts that its members and other constituents be registered to vote — and do vote — in support of candidates and initiatives that advance its core

7

concerns. If Subsection 6 is not enjoined before the 2008 election cycle, HAGC will experience frustration of its mission to ensure that its members and other individuals in the Haitian American community are registered and able to participate in elections. Moreover, HAGC will be forced to divert substantial resources to resolve unnecessary difficulties encountered by citizens who have not been registered because of Subsection 6 and who therefore encounter problems in attempting to vote. Finally, some of HAGC's members, and some of the citizens HAGC will recruit as new members, will be eligible to register and vote, and will want to register and vote in the 2008 election cycle, but will be unduly delayed or denied in registering because of Subsection 6.

19.    The rights this suit seeks to vindicate are germane to the purposes of Plaintiffs, and the claims alleged herein do not require the participation of their individual members or clients in the lawsuit. Indeed, without the relief requested herein, these organizations will be harmed by the substantial diversion of their resources and the frustration of their organizational purposes.

20.    A significant number of individual members, clients, and constituents of Plaintiffs who are over 18 years of age, United States citizens, and legal residents of Florida, who have not been convicted of a felony (or have had their civil rights restored) or adjudicated mentally incapacitated with respect to voting (or have had their right to vote restored), and who are eligible but not registered to vote at their current residence, will also be harmed. They will want to vote in the January 29, 2008 presidential preference primary election, the August 26, 2008 federal primary election, and/or the November 4, 2008 federal general election, and will attempt to register to vote. Florida's

8

matching requirement, however, will block them from becoming registered to vote —
many without knowing their application was rejected until they show up at the polls.
Without clearing burdensome bureaucratic obstacles, none of these eligible voters will be
able to cast a valid vote.

21.     Defendant Kurt S. Browning is sued in his official capacity as the
Secretary of State of Florida. His official residence is at the R. A. Gray Building, located
at 500 South Bronough Street in Tallahassee, Florida, 32399-0250. The Secretary of
State is designated by law as the "chief election officer of the state," Fla. Stat. §
97.012(1), and, as such, is responsible for supervising and administering election laws, *id.*
§§ 97.012, 101.58. Among other things, the Secretary of State must ensure that federal
election laws are interpreted and implemented in a uniform and nondiscriminatory
manner throughout Florida. *See, e.g., id.* § 97.012; 42 U.S.C. § 15483(a)(1)(A); 42
U.S.C. § 1973gg-8 ; *Bush* v. *Gore,* 531 U.S. 98, 116 (2000). As such, the Secretary of
State must coordinate the State's responsibilities under the National Voter Registration
Act ("NVRA") and has the ultimate responsibility to ensure that every eligible applicant
for voter registration is registered to vote. *See* Fla. Stat. § 97.012 (7); 42 U.S.C. §
1973gg-6(a)(1). It is his duty to ensure that all voter registration applications and forms
prescribed or approved by the Division of Elections are in compliance with the NVRA
and the Voting Rights Act. *See* Fla. Stat. § 97.012(9). The Secretary of State is also
charged with "[c]reat[ing] and administer[ing] a statewide voter registration system as
required by the Help America Vote Act of 2002." *Id.* § 97.012(11). He must also
oversee all administrative complaint procedures for violations of the NVRA, *see id.* §

9

97.023, and for violations of Title III of HAVA, *see id.* § 97.028.  Finally, the Secretary of State has authority to issue rules adopting uniform standards for interpreting and implementing Florida statutes governing voter registration, *id.* § 97.012(2), including standards relating to the "single, uniform, official, centralized, interactive, computerized statewide voter registration system" mandated by HAVA, *id.* § 98.035.

## THE FACTS

### I.

### FLORIDA'S "MATCHING" LAW

#### Overview

22.     Article VI, Section 2 of the Florida Constitution imposes only three basic eligibility requirements on its citizens before they are permitted to exercise the right to vote.  An individual is eligible to vote if he or she registers and is:  (1) a citizen of the United States; (2) at least 18 years old; and (3) a permanent resident of the State.

23.     Article VI, Section 4 of the Florida Constitution provides that eligible voters may be disqualified from voting in only two circumstances:  if an individual is convicted of a felony, or adjudicated as mentally incompetent with respect to voting, she is not eligible to vote until her civil rights are restored.

24.     To regulate voters' ability to be included on the State's new computerized voter registration list, Florida Session Laws Chapter 2005-278 created Subsection 6, which originally took effect on January 1, 2006, and has been subsequently amended effective January 1, 2008.   Subsection 6 was adopted purportedly to comply with HAVA's voter registration requirements.

10

25.     Subsection 6 is part of Section 97.053, which generally governs voter registration applications.     The statutory section requires, *inter alia*, that certain identifying information be provided on new voter registration applications. Specifically, Section 97.053(5) provides that a "voter registration application is complete if it contains," among other information, "[t]he applicant's current and valid Florida driver's license number or the identification number from a Florida identification card," or, "[i]f the applicant has not been issued a current and valid Florida driver's license or a Florida identification card, the last four digits of the applicant's social security number." Fla. Stat. § 97.053(5)(a)(5). This Section further states that "[i]n case an applicant has not been issued a current and valid Florida driver's license, Florida identification card, or social security number, the applicant shall affirm this fact in the manner prescribed in the uniform statewide voter registration application." *Id.* (For purposes of this complaint, there is no difference between Florida's use of the driver's license and identification card numbers. Unless otherwise noted, all references hereafter to Florida driver's license numbers apply equally to identification card numbers as if fully set forth in each such reference.)

26.     Under Subsection 6, a voter registration application will not be accepted as "valid" unless and until the State performs a successful database match or otherwise verifies the number provided by the applicant. Thus, even if the applicant is eligible to vote, fills out all material elements of the application truthfully and completely, and does so before the book-closing deadline (*e.g.*, December 31, 2007), she will not be registered

11

and will not be allowed to cast a regular ballot on election day if the State fails to match or otherwise verify her identifying information.

27.     Here is how Subsection 6, as amended effective January 1, 2008, works:

28.     *First*, it requires the Secretary of State to match applications with other databases or otherwise verify the identifying number of all new applicants: "A voter registration application may be accepted as valid only after the department [of state] has verified the authenticity or nonexistence of the driver's license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant." Fla. Stat. § 97.053(6). On information and belief, and as alleged below in paragraphs 45-47, Florida first will attempt to match information — including the identifying number, first name, and last name — on a voter registration application to corresponding information in records maintained by the Florida Department of Highway Safety and Motor Vehicles or U.S. Social Security Administration.

29.     *Second*, if the Secretary of State fails to match the application, it is deemed "incomplete" and relegated to bureaucratic limbo, where the burden is shifted back to the applicant: "If a completed voter registration application has been received by the book-closing deadline but the driver's license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant cannot be verified, the applicant shall be notified that the application is incomplete and the voter must provide evidence to the supervisor sufficient to verify the authenticity of the number provided on the application." *Id.*

12

30. *Third*, if the applicant is not reached or has not mustered the "necessary evidence" to verify her identifying number, she will not be placed on the registration rolls and will not be permitted to vote by regular ballot: "If the voter provides the necessary evidence, the supervisor shall place the voter's name on the registration rolls as an active voter. If the voter has not provided the necessary evidence or the number has not otherwise been verified prior to the applicant presenting himself or herself to vote, the applicant shall be provided a provisional ballot." *Id.*

31. *Fourth*, if such a non-matched voter seeks to vote and is given a provisional ballot, that ballot will *not* be counted unless, within two days after the election, the voter "presents evidence" to the county supervisor to "verify" her identifying number: "The provisional ballot shall be counted only if the application is verified by the end of the canvassing period or if the applicant presents evidence to the supervisor of elections sufficient to verify the authenticity of the driver's license number, Florida identification card number, or last four digits of the social security number provided on the application no later than 5 p.m. of the second day following the election." *Id.* On information and belief, many, if not all, election officials will only accept the official original source of a number — the driver's license, identification card, or Social Security card itself — as evidence sufficient to verify that number.

32. If the number on the registration application was inadvertently mis-written or mis-typed in the first place, the number cannot be "verified" and the provisional ballot will not be counted. Likewise, on information and belief, if the other identifying information on the application does not "match" the evidence presented by the applicant

13

to "verify" the identifying number, that evidence will not suffice and the provisional ballot will not be counted. To take just one example, if after voting a provisional ballot an applicant submits her driver's license to verify the driver's license number on her application, but the license is in her maiden name and the application is in her married name, the license will not be sufficient to verify the number and the provisional ballot will not be counted.

33. Florida has thus transformed the administrative government function of assigning each voter a unique identifying number into a barrier to registration and voting. Perfectly eligible and truthful registration applicants whose information does not exactly "match" information in other databases suddenly become presumptively ineligible, and will have to struggle — often without knowing the problem and often unsuccessfully — to have their votes counted.

34. As alleged in detail below, the State will fail to match thousands of new applicants for reasons having nothing to do with their eligibility. Even assuming every such non-matched applicant actually receives timely notice — an unrealistic and impractical assumption given the crush of applications election officials will have to process in the weeks prior to election day and given the likelihood of typos in the applicant's address, among other problems — many will have no idea why their application is deemed incomplete or how to fix the problem. When Social Security information does not match, neither the State nor the applicant is told the reason for the failed match. An applicant cannot cure a problem if he is not told what the problem is. The U.S. Government Accountability Office recently reported that with respect to

14

matching Social Security number information, "the biggest problem [state officials] are facing is that [the Social Security Administration] is not specifying what voter information was not matching (*i.e.*, was the mismatch in name, date of birth, or 4-digit Social Security number). Without this information they are not able to efficiently resolve the non-matching problems."

35.     If the problem has not been resolved by election day, eligible voters will have to overcome more unnecessary obstacles. As outlined above, non-matched applicants who never receive the notification of the failed match (or who mistakenly believe the problem has been resolved) and then show up at the polls on election day, are given "provisional" ballots. These ballots may not lawfully be counted by any supervisor of elections until further hurdles have been cleared. *First*, the poll worker must understand from the materials available to her at the polls that the voter's identifying number has not been verified. *Second*, the poll worker must tell the voter that she must make a trip to the county supervisor's office within two days and present evidence to verify her number. *Third*, the voter must be able to make the trip during business hours on a weekday. *Fourth*, the evidence the applicant presents must be deemed "sufficient." If any one of these things doesn't happen, the voter's provisional ballot will not be counted.

36.     Some non-matched applicants who manage to overcome all these bureaucratic barriers and present evidence of their identifying number will still be denied the right to vote because of immaterial errors or omissions. For example, if an applicant mistakenly transposed or dropped a digit in her driver's license number when she filled

15

out the registration application, she can arrive at the county supervisor's office with valid identifying documentation — driver's license, military identification, Congressional ID, passport, etc. — but it will be to no avail. Because no evidence will be sufficient to "verify the authenticity" of the errant number on the application, her provisional ballot will not be counted.

37.     Accordingly, Subsection 6 will create an electronic and bureaucratic obstacle course, imposing a series of unlawful, unconstitutional, and often impossible burdens on citizens seeking to exercise their fundamental right to vote.

38.     Subsection 6 also is arbitrary: it impacts all new registrants *except* those who have no Social Security number or driver's license number, who may vote a regular ballot if they present one of several readily available identification documents well after the registration deadline.

39.     The unlawful prerequisites also foster uneven treatment of voters depending on their county of residence, given that, as alleged below, there is no uniform standard for what notice counties are required to give non-matched applicants, what information poll workers must provide non-matched applicants who submit provisional ballots, or what evidence is sufficient for those ballots to count. They foster uneven treatment of voters depending on whether they submit Social Security digits or a driver's license number on their registration forms, given the different error rates involved in the relevant matching processes, as alleged below. And they foster uneven treatment of voters based on their race or ethnicity, given the distinct problems with matching faced by members of different racial or ethnic communities, as alleged below.

16

## II.

## "MATCHING"

40.     To create its new computerized voter registration list, Florida, like most states and the District of Columbia, has embarked on an ambitious and complex project that will take many election cycles to complete. As experts and the vast majority of states recognize, and as the results of the first election cycle prove, this project will move in fits and starts, with errors inevitable.

41.     Florida residents who are eligible to vote will fill out voter registration application forms by hand and submit them in person, by mail, or through a third party to an appropriate State or county office, including a State voter registration agency under sections 5 and 7 of the National Voter Registration Act (42 U.S.C. §§ 1973gg-3, 1973gg-5).

42.     If an application is completed at an office of the Department of Highway Safety and Motor Vehicles, an official will manually input the information contained on the form into a statewide system, and the data will be transferred electronically to the appropriate county supervisor of elections ("supervisor") for the county in which the voter resides. For all other applications, the form will be transferred to the custody of the appropriate supervisor, who will then manually input into the county voter registration database the information contained on the application, including name, address and identification number. The information on each application will be entered into its own electronic record containing a number of data fields.

17

43.     The supervisor will then electronically transfer those records to the statewide voter registration database for "matching."

44.     On information and belief, starting January 1, 2006, the date the original version of Subsection 6 went into effect, the Secretary of State began attempting to match the record received from the county supervisors (called the "Registration Record") with driver's license information maintained by the Department of Highway Safety and Motor Vehicles ("DHSMV") or Social Security information maintained by the Social Security Administration ("SSA"). On information and belief, this procedure was conducted even for voter registration applications completed at the DHSMV.

(a)     Driver's Licensing Number Matching. The Secretary of State and the Director of the DHSMV have entered into an agreement to match information on registration applications with information in the DHSMV's driver's license database ("DHSMV Database"). *See* Fla. Stat. § 97.057(11) (state and DHSMV shall enter agreement "to match information in the statewide voter registration system with information in the database of the Department of Highway Safety and Motor Vehicles to the extent required to verify the accuracy of the driver's license number, Florida identification number, or last four digits of the social security number provided on applications for voter registration").

(b)     Social Security Number Matching. The Department of State and DHSMV has entered into an agreement with the Commissioner of Social Security to match information on registration applications with information in the SSA's database ("SSA Database"). *See* Fla. Stat. § 97.057(12). On information and belief, the DHSMV has signed one contract with the American Association of Motor Vehicle Administrators ("AAMVA") to facilitate the process of matching Social Security numbers against the SSA Database for the purpose of providing driver's licenses. The DHSMV has also signed a contract with the AAMVA to facilitate the process of matching Social Security number digits against the SSA Database for the purpose of registering voters. On information and belief, AAMVA's matching process for the purpose of providing driver's licenses is meaningfully different from — and somewhat less likely to reject eligible

18

citizens than — its "matching" process for the purpose of voter registration.

45. For applicants who provide Social Security digits on the application form, the Secretary of State attempts to match applications with information collected by the SSA. On information and belief, after testing to determine whether the applicant in fact has a valid driver's license number, the target Registration Record is submitted electronically through the DHSMV for comparison against SSA data. SSA systems first seek all records in the SSA Database for which the last four digits of the listed Social Security number exactly match the last four digits of the Social Security number of the target Registration Record. Given that approximately one in 10,000 Americans share the same last four digits of their Social Security numbers, there are thousands of such matches: the SSA recently stated that every "last four" digit combination returns approximately 40,000 Social Security numbers. The systems then attempt to match the first name, last name, month of birth, and year of birth of the target Registration Record to the first name, last name, month of birth, and year of birth of one or more of the records containing these matching Social Security number digits.

46. On information and belief, a successful match is reported only for records in which each character of each such data field in a target Registration Record matches precisely each character of each corresponding data field in the SSA Database. Thus, if LYDIA GONZALES is registered in the SSA Database, but an election worker enters her name as LYDIA GONZALEZ, the SSA will report "no match" even though her first

19

name, month of birth, year of birth, and the last four digits of her Social Security number all match.

47.     For applicants who provide a driver's license number on the application form, the Secretary of State attempts to match their applications with information collected by the DHSMV. On information and belief, when a target Registration Record is submitted electronically to the DHSMV, DHSMV systems first seek all records in the DHSMV Database for which the driver's license number exactly matches the target Registration Record. The systems then attempt to match the first and last name of the target Registration Record to the first and last name of the records with a matching driver's license number; unless the names match exactly, the match is reported as unsuccessful. (If the first four characters of both the first and last name match exactly, the record may be held for further review, but the voter cannot at that point be registered.) On information and belief, Florida has not published specific criteria to "verif[y]" the "nonexistence" of a number under Subsection 6 — that is, whether registrants who do not submit a Social Security or a driver's license number on their voter registration form in fact have neither such number.

48.     Numerous attempts to match information from voter registration applications with information in records of other State and federal databases will fail for reasons unrelated to the eligibility and identity of the voters.

## A.      Errors in Inputting, Maintaining and "Matching" Data in the Databases

49.     On information and belief, beginning January 1, 2006, a significant number of attempts to match information of eligible voters in Registration Records,

including information of individual members, clients, and constituents of Plaintiffs, to information within records of the SSA Database or DHSMV Database resulted and will continue to result in false negatives — *i.e.*, matches that appear to fail even though the person who applied to register to vote is, in fact, the person listed in the SSA Database or DHSMV Database. The reasons for these false negatives are myriad, and very common.

### 1. Inputting the Data

50.     Data entry operators make mistakes when they input information initially written down by hand into a computer database. On information and belief, the large sources of data at issue here — the Registration Records, DHSMV Database, and SSA Database — each contain errors due to such mistakes. Data entry errors made many years ago may result in a "no match" today.

51.     Some of these mistakes are typographical errors, such as:

- misspellings (*e.g.*, "GRAHAM" becomes "GRAMM" or "LOPEZ" becomes "LOPES" OR "CARRERO" becomes "CARRERA");

- omitting characters (*e.g.*, "LOCKE" becomes "LOCK" or "JOHN" becomes "JON");

- adding characters (*e.g.*, "OWEN" becomes "OWENS");

- transposing characters (*e.g.*, "SIERRA" becomes "SEIRRA"); and

- striking an adjacent key (*e.g.*, "SMITH" becomes "SMOTH").

- confusing one character for another (*e.g.*, in a driver's license number, "PØ14-233-80-034-1" becomes "PO14-233-80-034-1").

52.     Other mistakes are caused by the data entry operator's incorrect use of the data fields. For instance, the data entry operator can fail to enter information provided

GREENBERG TRAURIG, P.A.

for a particular field. Or the data entry operator can enter information into the wrong

field, as the following examples illustrate:

- transposing the surname and given name (*e.g.*, "BAO LU" becomes "LU BAO");

- omitting fields (*e.g.*, "MARIE-MAUDE" becomes "MARIE");

- adding fields (*e.g.*, "JAMES THOMAS" becomes "JAMES J THOMAS" or "MR JAMES THOMAS" or "CAPT JAMES THOMAS");

- improperly separating fields, *e.g.*, a hyphenated last name is separated into a middle name and last name ("ILEANA" "ROS-LEHTINEN" becomes "ILEANA" "ROS" "LEHTINEN"), or a hyphenated first name is separated into first and middle names ("JEAN-CLAUDE" becomes "JEAN" "CLAUDE"); and

- improperly combining fields, such as the middle (or maiden) and last names (*e.g.*, "DEBBIE" "WASSERMAN" "SCHULTZ" becomes "DEBBIE" "WASSERMAN-SCHULTZ").

53.     Basic data entry errors such as these are common. One study by Abt Associates, a government and business research and consulting firm, found that as many as 26% of records listed in a Florida social service database included city names that were spelled differently from the same names on a master list. Among other errors, this database reflected more than 40 different spellings of Fort Lauderdale.

54.     Data entry errors also affect eligible voters. On information and belief, there are or will be data entry errors involving the identifying number, name, or date of birth within individual records of databases maintained by State agencies, including the DHSMV Database and the Registration Records collected by Defendant, and federal agencies, including the SSA Database. On information and belief, the attempt to match

22

information of a significant number of eligible voters' Registration Records to information within records of the DHSMV Database and the SSA Database has failed and will continue to fail due in part to these data entry errors.

## 2. Errors in Maintaining, Storing, Transferring, and Transforming the Data

55. Once a Registration Record is created for an individual registrant, the State must maintain, store, transfer, and, often, transform the data contained in that record. Federal and State officials must periodically perform similar tasks with respect to data contained in the SSA and DHSMV Databases.

56. On information and belief, human error or computer malfunction — such as file corruption caused by computer viruses — made or occurring during the process of maintaining, storing, and transferring these computerized records will also cause relevant errors within individual records of databases maintained by State agencies, including the DHSMV Database and the Registration Records collected by Defendant, and federal agencies, including the SSA Database. For example, if the State updates the software it uses for one of its databases, but the new software does not recognize compound last names without hyphens and splits such names into middle and last name fields, the record will no longer be able to produce a match.

57. On information and belief, federal and State officials have engaged in or will engage in multiple types of data transfer and transformation with respect to the data contained in the Registration Records and the SSA and DHSMV Databases. An example of such actions includes transferring data electronically from the 67 county election

23

management systems to the Secretary of State, and then to an interface with the SSA or the DHSMV.

58. On information and belief, the attempt to match information of eligible voters within Registration Records to information within records of the DHSMV Database and the SSA Database will fail due in part to errors arising from the maintenance, storage, transfer, and transformation of this data.

### 3. Errors in Matching the Data

59. The errors described in the foregoing sections can occur in isolation, or in combination with other errors in individual records. But whether or not such errors exist, when an attempt is made to match information contained in the records of two or more large databases, superficial and other nonmaterial differences between those records can result in "false negative" results. A false negative occurs when a test incorrectly reports a negative result — *e.g.*, when a medical test fails to indicate that a patient has a specific disease or condition, or when radar fails to indicate the presence of an airplane within a scanned area. The rate of "false negatives" increases when there are errors within individual records — for example, where, as here, a Floridian is inputted at different times into the SSA Database and Registration Record, a data entry error in either will produce a false negative. However, false negatives are intrinsic to the process of matching and thus frequently occur even when the original data was inputted correctly.

60. Examples of the many trivial differences that can cause false negative matching results include:

24

- one record contains a nickname and the other contains the full given name (*e.g.*, "MANNY" and "MANUEL," or "LIZ" and "ELIZABETH," would not match);

- one record contains one spelling of a transliterated foreign name or name using a diacritical mark, the other record contains an alternative spelling, and the matching algorithm does not recognize equivalences (*e.g.*, "MUHAMMAD" and "MOHAMMED" or "DE LA CRUZ" and "DELACRUZ," or "SCHRÖDER" and "SCHROEDER," would not match);

- one record recognizes characters with diacritical marks, the other record does not, and the matching algorithm does not recognize equivalences (*e.g.*, "RODRÍGUEZ" and "RODRIGUEZ" would not match);

- one record contains a first or middle initial and the other record contains the full name (*e.g.*, "F. SCOTT FITZGERALD" and "FRANCIS S. FITZGERALD" would not match);

- one record contains punctuation within a name and the other record omits the punctuation (*e.g.*, "O'BRIEN" and O BRIEN" would not match);

- one record contains a woman's maiden name or her husband's name and the other contains her own married name (*i.e.*, "MRS. REBECCA JONES" and "MRS. REBECCA SMITH," or "MRS. JOHN SMITH" and "MRS. REBECCA SMITH," would not match); and

- one record contains an "Americanized" name used for some purposes and the other record contains a different given name used for some purposes (*e.g.*, "GRACE KIM" and "HYUN KIM" would not match).

61.     On information and belief, the attempt to match information contained in individual Registration Records to information contained in individual records of the DHSMV Database and the SSA Database has produced and will continue to produce a significant number of false negative results due to these and other apparent differences, and to errors in the protocol or systems for matching among the databases.   Indeed,

25

defendant has already publicly admitted "[p]roblems with hyphenated names and married names" that may cause false negative results.

62.     False negatives will arise more often when attempting to match the personal information of residents of certain racial and ethnic communities, including communities with substantial presence in Florida.

63.     Examples of errors more likely among these racial or ethnic communities include:

- improper separation and combination of fields in names of Latinos and Hispanics, many of whom use both maternal and paternal last names, and in names of Haitian Americans, many of whom hyphenate their first two names (*e.g.,* Jean-Bertrand);

- incorrect spellings of unique names or derivatives of common names with unfamiliar spellings, which are particularly prevalent within the African-American community;

- transposed date and month of birth among recent immigrants, who may be accustomed to presenting dates in the day-month-year configuration standard in many countries;

- mismatched transliterated names of citizens whose primary language does not use the Roman alphabet or uses diacritical marks not found in English;

- transposition of the given name and surname of Asian Americans, many of whom present their surname first and their given name second; and

- inconsistent use of "Americanized" names and other given names of Asian Americans and others, many of whom use different names for different purposes, but regard both names as their own.

## B.      Error Rates Relevant to the Matching Process in Florida

64.     Public institutions and private enterprises use several different methods to

match information between databases.     The strictest protocol involves the exact

26

character-by-character matching of all characters within one field or multiple fields. With character-by-character matching, one incorrectly entered character of one number or one name in a field targeted for matching will preclude a match between two otherwise identical records. EDUARDO DOMÍNGUEZ, born November 9, 1960, whose Social Security number ends in 2703, will not match EDUARDO DOMÍNQUEZ, born November 9, 1960, whose Social Security number ends in 2703, because a single letter in his surname was typed incorrectly by a data entry operator.

65.    Character-by-character "matches" are therefore extremely sensitive to all of the errors described above — both those that occur within individual databases and those that arise when comparing records between databases. The U.S. Census Bureau has reported, for example, that more than 25% of the same individuals reflected in a pre- and post-census analysis would not have been found by an exact character-by-character match.

66.    On information and belief, the protocol used to match information on those Florida voter registration applications that are submitted with the last four digits of a Social Security number is an exact character-by-character match protocol developed in conjunction with the SSA. On information and belief, the AAMVA agreement with the SSA as it pertains to matching Social Security digits and other identifying information submitted with voter registration applications uses a *more* rigid match protocol than is used for verifying similar data submitted with driver's license applications.    The character-by-character protocol used for voter registration matching will not account for common typographical errors and other mistakes made when data entry operators input

27

the data into Registration Records and into the SSA Database, errors arising from the maintenance and storage of that data in both instances, or the false negative results that will occur when an attempt is made to match information within the two sets of records.

67. Evidencing the problem with using character-by-character matching, the Social Security Administration recently reported that, of 2.6 million voter registration records submitted to the SSA through February 2007, 46.2% — *nearly half of the records* — resulted in a failed match. On information and belief, the vast majority of the 46.2% failed matches represent false negatives – *i.e.*, eligible voters who do exist in the SSA Database, but whose records were not accurately matched.

68. Jurisdictions using a character-by-character match protocol similar to the protocol used for these Florida voters, as described in paragraphs 45-47 and 64, experience high rates of false negative matching results.

69. On information and belief, a character-by-character match protocol was used in New York City to match the driver's license numbers on voter registration applications to driver's license numbers on the state's motor vehicles file. In September 2004, the City Board of Elections sent 15,000 registration applications with driver's license numbers to the state Department of Motor Vehicles for matching. An audit revealed that of the total applications processed, a total of 2,951 — 19.6% — did not match due solely to data entry errors. Moreover, in this matching process, only the driver's license number itself was matched; if the matching required a comparison of additional information, such as name or date of birth, the error rate would have been higher.

28

70.     On information and belief, Virginia used a character-by-character match protocol before the 2004 federal election in an attempt to match the Social Security number on 80,000 voter registration applications against the state's motor vehicles file. Of the 80,000 records processed, approximately 20% did not match. On information and belief, Virginia included all such registrants on its registration rolls, regardless of whether their information produced a match.

71.     On information and belief, in early 2006, California used a character-by-character protocol in an attempt to match voter registration information against information in the state's motor vehicles file or the Social Security Administration's database. Of 64,673 records processed for Los Angeles County, approximately 18% were not matched, and another 7.5% were returned because of a system error, including a system "time out" or other system "down time."

72.     On information and belief, in the first six months of 2006, Washington State's use of a character-by-character protocol for voter registration applications resulted in a statewide non-match rate of 16% – and a rate of as high as 30% in King County, the county that includes the most populous areas in the state, including Seattle.

**C.    Nonmaterial Errors or Omissions on Voter Registration Applications**

73.     Nonmaterial errors and omissions on voter registration applications themselves will also contribute to false negative results.

74.     The audit of 15,000 New York City registration applications discussed in paragraph 69 consisted of a review of the scanned original of each of the 3,568 applications that did not produce a match. Of the failed matches, 82.9% were due to data

29

entry errors made by election officials. The other failed matches were due to a handful of errors made by the Department of Motor Vehicles and approximately 600 errors or omissions made by voters, such as filling in a Social Security number on the line provided for the driver's license number (the same type of error made by election officials inputting the data), which should not have affected the City's ability to verify the applicants' eligibility.

75.     Such errors or omissions are not material in determining whether the applicant is qualified to vote.

76.     On information and belief, nonmaterial errors and omissions on voter registration applications submitted by eligible Florida citizens have produced and will continue to produce a significant number of false negative results due to the data entry and matching errors described above.

## III.

## UNDUE BUREAUCRATIC HURDLES

77.     When the State fails to match information on a voter registration application, the identifying number is deemed unverified and the application is declared "incomplete." No ballot will be counted if cast by a voter whose voter registration application is incomplete.

78.     Each county is then responsible for attempting to notify such applicants. On information and belief, no State guidance makes this notification uniform, and the content of the notice will therefore depend on the county in which the voter attempts to register.

30

79.     In many instances, the notification will not reach the applicant. In those instances in which it does, the notification will not always be adequate to allow the voter to remedy the problem because it will not adequately identify the problem. When Social Security information fails to match, for example, neither the State nor the applicant is told why — *e.g.*, if a digit has been mistyped or a married name in one source has not matched a maiden name in another, the State is informed only that no matching record has been found. As noted in paragraph 34, the biggest problem associated with matching Social Security digits is the SSA's failure to specify what causes mis-matches, which hinders efforts to resolve matching problems.

80.     In many other instances, the notification will not be adequate to allow the voter to remedy the problem because it will not identify the solution required. In other cases, the notification will not be adequate because it will not be timely. A disproportionately high number of applications are submitted in the final week of the registration period. In 2004, 132,000 forms — nine percent of the total for the year — were submitted in the final week. On information and belief, given the large volume of these registration forms during the period most likely to strain the resources of county supervisors with other pre-election activities, there will be a delay in processing the forms of many applicants, a delay in attempting to match the identifying number of many applicants, a delay in reporting the resulting failed match of many applicants, and a delay in attempting to deliver notifications to applicants.

81.     Those eligible citizens who are not able to remedy the State's failure to verify their identification number by election day will face additional barriers to voting.

31

Such eligible voters will only be permitted to vote provisional ballots, which will not lawfully be counted unless a series of further hurdles has been cleared. Within two days of casting a provisional ballot on election day, these voters must make a separate and unnecessary trip to the office of the supervisor of elections to present their driver's license or Social Security card in order to verify the identifying number listed on their applications. This is true even though many of these voters will already have shown their driver's license at the polls, since Florida law requires all voters to show one of various forms of photo identification — including driver's licenses — when voting in person. *See* Fla. Stat. § 101.043.

82. The ability of provisional ballot voters to make sure their ballots are counted depends on such voters being properly and fully advised of their rights at the polls on election day, which will not always be the case. On information and belief, in some counties, voters whose applications are deemed incomplete because of the State's failure to verify their driver's license number or Social Security digits will not be so designated on the pollbook. When these voters arrive at the polls, neither the poll worker nor the voter will know that the State has failed to verify the number on the registration form — or what must be done to complete the voter's registration and have the provisional ballot counted. Further, on information and belief, the State has not published guidance to ensure that poll workers uniformly inform unmatched voters that they must travel to the county supervisor's office within two days to present evidence sufficient to verify this number. On information and belief, poll workers at some locations will fail to inform such voters that they must travel to the county supervisor's

32

office within two days to present evidence sufficient to verify these numbers. Even if the poll workers inform such voters of the need to present evidence at the county supervisor's office, they may fail to inform the voters of the reason for the failed match or the evidence required to remedy the situation.

83.     In addition, Florida does not provide a legal right for employees to take time off from work for voting, on election day or otherwise. A voter who discovers on election day that her identifying number has not been verified will have to take time off from work — if she is able to take time off from work without jeopardizing her employment — to travel to the office of the supervisor of elections, during business hours and within two days of the election, to present evidence to verify the number. The provisional ballots of such voters who are not able to take the time off from work will not be counted.

84.     Moreover, for some voters, even prompt notice, abundant documentation, and adequate free time will not suffice. Any voter who has inadvertently submitted a driver's license number or Social Security digits with a single erroneous or omitted character will be barred, unless corrected before the voter registration deadline, from casting a valid ballot. Such voters who submit registration forms at or near the deadline will not be notified of their errors until it is too late, and will have no opportunity to present any evidence at all to correct the problem.

85.     On information and belief, the bureaucratic hurdles described above will unduly burden eligible Florida citizens, and prevent many eligible Florida voters from casting a ballot that may lawfully be counted.

## IV.

## THE HELP AMERICA VOTE ACT OF 2002

86.     The origins of the Florida matching law lay in the 2000 Presidential Election and a misinterpretation of the resulting legislation passed by Congress in 2002.

87.     In the 2000 Presidential Election, thousands of registered voters in every state were turned away from the polls without casting a ballot due to administrative errors in the election administration process. As has been well documented in Florida and other states, many eligible voters were turned away simply because poll workers could not find their names on their lists of registered voters. In many cases, these rejected voters were eligible and properly registered, and in other cases, the names were improperly omitted from the registration rolls. To revive confidence in the electoral system, Congress passed the Help America Vote Act ("HAVA"), which was signed into law by President Bush on October 29, 2002.

88.     The language and legislative history of HAVA make clear that the statute was passed in large part to ensure that eligible and registered voters would not be left off the voting rolls or turned away from the polls. HAVA seeks to accomplish this goal primarily through two provisions: (1) requiring each state to adopt a computerized statewide voter registration list and to ensure that the list is complete and accurate, and (2) permitting provisional balloting so that no eligible voter is denied the right to cast a ballot. The National Commission on Election Reform, chaired by former Presidents Ford and Carter, explained that these two policy goals were "connected" and that, "[i]n both we are motivated by a consistent goal: No American qualified to vote anywhere in her or

34

his state should be turned away from a polling place in that state." National Commission on Election Reform, *To Assure Pride and Confidence in the Electoral Process* 35 (2001).

89.     HAVA thus ensures that voting and election administration systems will "be the most convenient, accessible, and easy to use for voters" and will "be nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and to have that vote counted." 42 U.S.C. §§ 15381(a)(1) and (3).

## A.     The Computerized Statewide Voter Registration List

90.     One of the primary purposes of HAVA is to reduce the burdens on voting caused by sloppy and incomplete voter registration lists. For decades, voters have been turned away from the polls or discouraged from voting due to shoddy, decentralized, and poorly maintained voter registration lists, most of which varied from county to county.

91.     To remove this bureaucratic barrier to voting, HAVA now requires the chief election official in each state to implement, in a uniform and nondiscriminatory manner, a "single, uniform, official, centralized, interactive computerized statewide voter registration list" that "contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State . . . ." 42 U.S.C. § 15483(a)(1)(A). This "computerized list" will be "the single system for storing and managing the official list of registered voters throughout the State." *Id.* § 15483(a)(1)(A)(i).

92.     HAVA further requires each State to ensure that "only voters who are not registered and who are not eligible to vote are removed from the computerized list" and

35

adopt "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* §§ 15483(a)(2)(B)(ii) and (4)(B).

**B.    Identifying Numbers for List Maintenance**

93.    In Section 303(a) of HAVA ("Section 303(a)"), 42 U.S.C. § 15483(a), Congress provided a mechanism for states to assign a "unique identifying number" for each new registered voter to enable the state to engage in better list maintenance.

94.    These unique identifiers were intended to ensure that each eligible voter is represented only once on the statewide voter registration list.    The unique identifier would allow a state, for example, to reliably keep track of voters who move and re-register in a new location, and to ensure that such voters are not doubly registered.

95.    For these list maintenance purposes, Congress sought to use unique identifying numbers already assigned to voters and maintained by the state, where possible.   Therefore, HAVA provides that a new application for voter registration must include either the applicant's driver's license number or the last four digits of the applicant's Social Security number. *Id.* §§ 15483(a)(5)(A)(i)(I) and (II).   Florida enacted this requirement in Subsection 5 of its matching law, Fla. Stat. § 97.053(5)(a)(5)(a), as noted above in paragraphs 24 and 25.

96.    HAVA goes on to provide that when an applicant does not have a driver's license or Social Security number, "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes."   *Id.* § 15483(a)(5)(A)(ii).   Accordingly, registrants with no driver's license or Social Security

GREENBERG TRAURIG, P.A.

number will be given an "identifying number" and entered on the computerized voter list without any further effort or procedure. *See also* Fla. Stat. § 97.053(5)(a)(5)(b).

97. For new registrants who *do* provide a driver's license number or Social Security digits, HAVA directs the states to "determine whether the information provided is sufficient to meet the requirements" of the computerized list. *Id.* § 15483(a)(5)(A)(iii). To that end, HAVA requires each state's chief election official to make an agreement with the state's motor vehicle authority to attempt "to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority," *id.* § 15483(a)(5)(B)(i), and a parallel agreement for the state's motor vehicle authority to make an agreement to match information with the Commissioner of Social Security, *id.* § 15483(a)(5)(B)(ii). In order to avoid conflicting entries in the state databases, to validate the unique identifiers provided, and to create a clean voter list, matching allows the states to "verify the accuracy of the information provided in applications for voter registration." *Id.* § 15483(a)(5)(B)(i).

98. The states' obligations to create and maintain the computerized list, to assign a "unique identifying number" for each voter, and to attempt to match information so that those numbers may be verified, are not preconditions to registering eligible voters. Rather, like all of the "Computerized statewide voter registration list requirements" set forth in Section 303(a), these are administrative obligations imposed on the states for the purpose of "storing and managing the official list of registered voters." 42 U.S.C. § 15483(a)(1)(A)(i). That is why HAVA provides that "a unique identifier is assigned to each legally registered voter in the State," not that a particular identifier must be matched

37

before a voter can be legally registered. *Id.* § 15483(a)(1)(A)(iii). New registrants with no current and valid driver's license or Social Security numbers – and voters in states collecting the full nine-digit Social Security number (which is what is truly "unique") – need not be matched. *Id.* § 15483(a)(5)(A)(ii) and (D). Assigning one unique identifying number for each applicant, not the "match" or the reified number on the form itself, is the requirement.

99.     Senator Christopher ("Kit") Bond (R-MO), one of the chief Senate sponsors of HAVA, explained that the purpose of these provisions was to create useful and dependable voter lists, not brand new obstacles to registering or voting:

> The conferees agree that a unique identification number
> attributed to each registered voter will be an extremely
> useful tool for State and local election officials in managing
> and maintaining clean and accurate voter lists. It is the
> agreement of the conferees that election officials must have
> such a tool. The conferees want the number to be truly
> unique and something election officials can use to
> determine on a periodic basis if a voter is still eligible to
> vote in that jurisdiction.

148 Cong. Rec. S10488-02, *S10490 (daily ed. Oct. 16, 2002). As voters are assigned these unique numbers, states will be able to identify with greater ease and certainty when a voter who has moved and applied to register in a new jurisdiction is still on the list in his or her old jurisdiction.

100.     The House of Representatives, in its report on HAVA, confirms this legislative intent:

> Creation of [a statewide voter registration database] will
> make the registration lists more accurate, and easier to
> update. It should reduce the incidence of voters appearing

38

> at a polling place only to discover that no record of their
> registration can be found. When voters move from one
> jurisdiction to another within that state, the statewide
> system will be able to track that movement. . . .
>
> It is likely that states will find it necessary to create a
> unique identifier to distinguish registered voters who
> happen to have the same name and/or birth date. The
> unique identifier so created will be used to assure that list
> maintenance functions are attributable to the correct voter;
> so as to avoid removing registrants who happen to have the
> same name and birth date as a felon, for example.

H.R. Rep. 107-329(I), at 36 (2001).

  101. Congress recognized that it would be helpful if the unique number
assigned to a registered voter were externally validated. 42 U.S.C. § 15483(a)(5)(B)(i)
and (ii). But in tacit acknowledgment of the limitations of the matching process,
Congress did not require that each number be validated before it is assigned. Indeed,
Congress did not require that states even *attempt* to validate each number before it is
assigned. Rather, HAVA requires states to attempt to match unique numbers only for
new registrants (that is, new voters or those who move and register in new jurisdictions).
Everyone else already on the rolls – the tens of millions of people who have been living
in the same county and voting for years – may simply be assigned a unique identifying
number for database maintenance purposes. The clear intention of HAVA is to create
complete and clean voter rolls by putting in place a national standard for uniform
statewide voter registration databases that, *over time*, will come to include a unique,
externally validated identifying number for every registrant. But given the limitations of

matching technology and the fact that it will not even apply to current voters, it will take many years to meet this goal fully.

102.    Each state has a responsibility to implement HAVA in a manner that preserves voters' access to registration and their ability to exercise the fundamental right to vote. In implementing the provisions that bear only on the maintenance by state bureaucracies of the voter registration list, Florida may not erect new barriers to voter registration.

## C.    Identifying Numbers for First-Time Voters Who Register By Mail

103.    The companion provision of HAVA regarding "Requirements for voters who register by mail," 42 U.S.C. § 15483(b) ("Section 303(b)"), confirms that the computerized list and the matching provisions were intended by Congress to make voting easier, not harder.

104.    In particular, HAVA uses the matching process to ease the burden on first-time voters who register by mail.

105.    As a general rule, Section 303(b) requires that a first-time voter who registers by mail must show some form of documentary identification, specified in the statute, either at the time of registration or when that individual goes to the polls to vote a regular ballot. *Id.* § 15483(b)(2)(A). However, no documentary identification is required if the state or local election official matches the driver's license number or last four digits of the Social Security number of the registrant "with an existing State identification record bearing the same number, name and date of birth." *Id.* § 15483(b)(3).

40

106. In other words, a first-time mail-in registrant need *not* be "matched" in order to be registered and in order to vote. She is registered and can vote a regular ballot by submitting identification with her registration application or by showing identification at the polls. HAVA's matching provisions merely provide a way to save first-time voters who register by mail from having to show documentary proof of identity when registering or voting.

107. HAVA's "Fail-safe voting" provision stands as additional proof that registration cannot rise or fall on the success of matching under the federal law. That provision specifies that a first-time mail-in registrant who fails to submit or present identification, and has not been matched, has a right to cast a "provisional ballot." *Id.* § 15483(b)(2)(B). These provisional ballots, however, can be counted only if the voter is validly registered. It cannot therefore be that the state's failure to find a match precludes registration. Such an interpretation would render meaningless HAVA's "Fail-safe voting" mechanism for first-time voters without identification: none of these provisional ballots would ever be counted because provisional ballots are only given to those citizens whose information has *not* been matched.

108. Subsection 6 perverts this structure by making the identifying number on the application the ultimate determinant of registration. Rather than using the identifying number as the unique identifier for the voter on the statewide registration list, as HAVA provides, Florida requires that if the number on the form cannot for some reason be verified, the application must be rejected. And rather than using the identifying number for first-time mail-in registrants as an alternative for identification, as HAVA provides,

41

Florida demands that voters whose numbers have not been matched show one piece of identification only: evidence to authenticate the number listed on the registration form.

### CLAIMS

### COUNT I

### (VIOLATION OF THE HELP AMERICA VOTE ACT: IDENTIFICATION PROVISIONS)

109.    Plaintiffs repeat and reallege paragraphs 1 through 108, as if fully set forth herein.

110.    To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, the statute violates the identification provisions of Section 303(b) of HAVA and interferes with federal rights secured by HAVA.

111.    By refusing to permit the registration of voters until a match is made, an identifying number is authenticated, or it is determined that the voter has no identifying number to be matched, as alleged above, Subsection 6 violates HAVA, including the provision that permits a first-time voter who registers by mail to provide identification at the time of voting or registration to verify his or her identity.    42 U.S.C. § 15483(b)(2)(A).

112.    The requirement that the Secretary of State match the driver's license number or Social Security number on an application form with existing records of the

42

DHSMV or SSA, otherwise validate the number, or determine that the applicant has no such number, is not a condition of eligibility to vote under the Florida Constitution.

113.   A first-time voter who registered by mail, who is otherwise eligible to vote under the Florida Constitution, and who provides the identification required by HAVA, as set forth above, is entitled to cast a regular ballot.

114.   Therefore, Subsection 6 conflicts with HAVA, a federal statute, and is preempted.

115.   Subsection 6 creates a real and imminent threat that eligible Florida voters, including individual members of Plaintiffs, will be deprived of their federal rights to cast regular ballots and to have those ballots counted, thereby frustrating Plaintiffs' mission of registering their members to vote and encouraging their members to participate in the political process. Subsection 6 also creates a real and imminent threat that Plaintiffs will be forced to divert their resources to assist their members and prospective registrants in providing additional "evidence" to accomplish matching and ensuring that any provisional ballots cast by their members and other prospective registrants, as a result of Subsection 6, will be counted. Plaintiffs and their members are being deprived of federal rights guaranteed under HAVA and 42 U.S.C. § 1983.

116.   Moreover, Subsection 6 threatens Plaintiffs' interests in ensuring that their members' rights to cast regular ballots in the January 29, 2008 presidential preference primary election, the August 26, 2008 primary election, and/or the November 4, 2008 general election, or to cast provisional ballots that are counted, are fully realized.

43

117. Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury through the interference of Subsection 6 with their federal rights.

118. Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights.

119. Defendant's conduct must be preliminarily and permanently enjoined to prevent enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT II

## (VIOLATION OF THE HELP AMERICA VOTE ACT: PROVISIONAL BALLOT PROVISIONS)

120. Plaintiffs repeat and reallege paragraphs 1 through 119 as if fully set forth herein.

121. To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, the statute violates the provisional ballot provisions of Section 303(b)(2)(B) of HAVA and interferes with federal rights secured by HAVA.

122. Specifically, by refusing to register voters until a match is made, an identifying number is authenticated, or it is determined that the voter has no identifying number to be matched, as described above, Subsection 6 violates HAVA's mandate that

44

any first-time voter who registers by mail but has not been matched by the state is entitled to cast a provisional ballot under Section 303(a) if that individual does not provide one of the forms of identification described in Section 303(b)(2)(A). *Id.* § 15483(b)(2)(B).

123. HAVA provides that a provisional ballot "shall be counted" where "the appropriate State or local election official . . . determines that the individual is eligible under State law to vote." *Id.* § 15482(a)(4).

124. The requirement that the State match the driver's license number or Social Security digits on an application form with existing records of the DHSMV or SSA, otherwise validate the number, or determine that the applicant has no such number, is not a condition of eligibility to vote under the Florida Constitution.

125. A voter otherwise eligible to vote under the Florida Constitution but who has not been matched and does not provide one of the forms of identification set forth in section 303(b)(2)(A) is entitled to cast a provisional ballot in Florida, but will not have his or her provisional ballot counted if the voter cannot be matched. Subsection 6 thereby renders HAVA's provisional ballot "fail-safe" a nullity.

126. Therefore, Subsection 6 conflicts with HAVA, a federal statute, and is preempted.

127. Subsection 6 creates a real and imminent threat that eligible Florida voters, including individual members of Plaintiffs, will be deprived of their federal rights to cast provisional ballots and to have those ballots counted. Subsection 6 also creates a real and imminent threat that Plaintiffs will be forced to divert their resources to assist their members and prospective registrants to meet their burden of providing additional

45

"evidence" to accomplish matching and ensuring that any provisional ballots cast by their members and other prospective registrants, as a result of Subsection 6, will be counted. Plaintiffs and their members are being deprived of federal rights guaranteed under HAVA and 42 U.S.C. § 1983.

128.    Moreover, Subsection 6 threatens Plaintiffs' interests in ensuring that their members' rights to cast provisional ballots in the January 29, 2008 presidential preference primary election, the August 26, 2008 primary election, and/or the November 4, 2008 general election, and to have their votes counted, are fully realized.

129.    Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury through the interference of Subsection 6 with their federal rights.

130.    Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights.

131.    Defendant's conduct must be preliminarily and permanently enjoined to prevent his enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT III

### (VIOLATION OF THE HELP AMERICA VOTE ACT: COMPUTERIZED STATEWIDE LIST REQUIREMENTS)

132    Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

133.    To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing

46

records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, the statute violates Section 303(a) of HAVA and interferes with federal rights secured by HAVA.

134. Specifically, by refusing to register voters until a match is made, an identifying number is authenticated, or it is determined that the voter has no identifying number to be matched, as described above, Subsection 6 violates the purpose and meaning of HAVA's "Computerized statewide voter registration list requirements," 42 U.S.C. § 15483(a), which make clear that the "matching" provision, *id.* § 15483(a)(5), was meant to be a means for state bureaucracies to carry out their responsibilities to create and maintain the computerized list, not impose a new, absolute precondition to registration.

135. Therefore, Subsection 6 conflicts with HAVA, a federal statute, and is preempted.

136. Subsection 6 creates a real and imminent threat that eligible Florida voters, including individual members of Plaintiffs, will be deprived of their federal rights to be placed on the registration lists, to cast valid ballots, and to have those ballots counted. Subsection 6 also creates a real and imminent threat that Plaintiffs' resources will be diverted by the attempt to remedy the fact that their members, clients, and constituents will be unable to be placed on the registration lists, to cast valid ballots, and to have those ballots counted. Plaintiffs and their members are being deprived of federal rights guaranteed under HAVA and 42 U.S.C. § 1983.

47

**GREENBERG TRAURIG, P.A.**

137.   Moreover, Subsection 6 threatens Plaintiffs' interests in ensuring that their members' rights to be placed on the registration lists, to cast valid ballots in the January 29, 2008 presidential preference primary election, the August 26, 2008 primary election, and/or the November 4, 2008 general election, and to have their votes counted, are fully realized.

138.   Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury through the interference of Subsection 6 with their federal rights.

139.   Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights.

140.   Defendant's conduct must be preliminarily and permanently enjoined to prevent his enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT IV

### (VIOLATION OF THE VOTING RIGHTS ACT: MATERIALITY PROVISION)

141.   Plaintiffs repeat and reallege paragraphs 1 through 140 as if fully set forth herein.

142.   To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security number on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined

48

that the applicant has no such number, the statute violates the Voting Rights Act and interferes with federal rights secured by that law.

143. Specifically, by refusing to register voters until a match is made, an identifying number is authenticated, or it is determined that the voter has no identifying number to be matched, as described above, Subsection 6 violates the Voting Rights Act's mandate that "No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C. § 1971(a)(2)(B).

144. As detailed above, many errors or omissions on papers or records relating to voter registration — whether caused by the applicant or anyone else, including but not limited to State and local employees and volunteers of voter registration groups – that will impact the State's ability to match that applicant's driver's license number or Social Security number, or determine that no such number exists, will not be material to determining whether the applicant is qualified to vote under Florida law.

145. Many nonmaterial mistakes beyond the control of the applicant – such as data entry errors by election officials, difficulties in retrieving information outside of the State's voter registration system, or technical malfunctions in the matching algorithms, all of which may render election officials temporarily or permanently unable to verify the submitted information of an eligible voter – are likely to occur. Other nonmaterial

49

mistakes made by the applicants themselves in filling out their voter registration applications are also likely to occur.

146. Such nonmaterial errors or omissions, and others not set forth herein, present a real and imminent threat that Plaintiffs' members will not be registered to vote and that Plaintiffs and their members will thereby be irreparably injured.

147. Therefore, Subsection 6 conflicts with the Voting Rights Act, a federal statute, and is preempted.

148. Subsection 6 creates a real and imminent threat that eligible Florida voters, including Plaintiffs' individual members, will be deprived of their federal rights to vote because of nonmaterial errors or omissions. Subsection 6 also creates a real and imminent threat that Plaintiffs' resources will be diverted by the attempt to remedy the fact that their members, clients, and constituents will be unable to cast valid ballots and to have those ballots counted. Plaintiffs and their members are therefore being deprived of federal rights guaranteed under the Voting Rights Act and 42 U.S.C. § 1983.

149. Moreover, Subsection 6 threatens Plaintiffs' interests in ensuring that their members' rights to cast ballots in the January 29, 2008 presidential preference primary election, the August 26, 2008 primary election, and/or the November 4, 2008 general election, and to have their votes counted, are fully realized.

150. Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury through the interference of Subsection 6 with their federal rights.

151. Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights.

50

152.    Defendant's conduct must be preliminarily and permanently enjoined to prevent enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT V

## (VIOLATION OF THE VOTING RIGHTS ACT: DENIAL OR ABRIDGMENT ON ACCOUNT OF RACE OR COLOR)

153.    Plaintiffs repeat and reallege paragraphs 1 through 152 as if fully set forth herein.

154.    To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, the statute violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and interferes with federal rights secured by that law.

155.    Section 2 of the Voting Rights Act, as amended, prohibits the use of a "voting qualification or prerequisite to voting or standard, practice or procedure" that results in a denial or abridgement of the right to vote on account of race or color.   42 U.S.C. § 1973.

156.    Racial and ethnic minorities, including individuals with foreign-language surnames, Hispanic or Latino citizens with compound last names, African Americans with unique names and spellings, Haitian Americans with compound first names, and Asian Americans with "Westernized" given names, are likely to suffer a disparate impact

51

as a direct result of Subsection 6, resulting in denial or abridgement of the right to vote on account of race in violation of Section 2 of the Voting Rights Act.

157.    Defendant's policy and practice of refusing to register to vote applicants whose identifying number cannot be verified will disproportionately impact Hispanic or Latino citizens, African-American, Haitian-American, and Asian-American applicants, as well as applicants who are members of other racial and ethnic groups, and will do so on account of their race or ethnicity.

158.    Absent this Court's intervention, Plaintiffs, their members, and similarly situated voters will suffer irreparable injury through the deprivation of their right to vote on account of race.

159.    Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights, privileges and immunities.

160.    Defendant's conduct must be preliminarily and permanently enjoined to prevent enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT VI

### (VIOLATION OF THE NATIONAL VOTER REGISTRATION ACT: REGISTRATION OF ELIGIBLE VOTERS)

161.    Plaintiffs repeat and reallege paragraphs 1 through 160 as if fully set forth herein.

162.    To the extent Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing

52

records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, the statute violates the National Voter Registration Act, or "Motor Voter Law," and interferes with federal rights secured by that law.

163. Specifically, by refusing to register voters until a match is made, an identifying number is authenticated, or until it is determined that the voter has no identifying number to be matched, as described above, Subsection 6 violates the Motor Voter Law, including the mandate that "each State shall . . . ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant" is submitted, mailed or otherwise received within the state voter registration deadline. 42 U.S.C. § 1973gg-6(a)(1)(A)-(D).

164. The Motor Voter Law's mandate that states accept and process valid voter registration forms remains in effect after the passage of HAVA. 42 U.S.C. § 15545(a).

165. Subsection 6 creates a real and imminent threat that eligible Florida voters, including individual members of Plaintiffs, will submit valid voter registration forms by the voter registration deadline, but will not be registered to vote. Subsection 6 also creates a real and imminent threat that Plaintiffs' resources will be diverted by the attempt to remedy the fact that their members, clients, and constituents will submit valid voter registration forms but will not be registered to vote.

166. Therefore, Subsection 6 conflicts with the Motor Voter Law, a federal statute, and is preempted.

167. Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury through the interference of Subsection 6 with their federal rights.

168. Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights.

169. Defendant's conduct must be preliminarily and permanently enjoined to prevent enforcement of Subsection 6 from interfering with federal rights and thereby causing irreparable injury to Plaintiffs and their members.

## COUNT VII

### (VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION: UNDUE BURDEN ON THE RIGHT TO VOTE)

170. Plaintiffs repeat and reallege paragraphs 1 through 169 as if fully set forth herein.

171. The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right. The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process. Moreover, the right to vote is a fundamental constitutional right incorporated into the Due Process Clause of the Fourteenth Amendment.

172. As detailed above, because Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the applicant's driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the

54

form, or it has been determined that the applicant has no such number, Subsection 6 imposes a severe burden on the fundamental right to vote of Plaintiffs' members by depriving thousands of voters of that right altogether. If enforcement of the statute is not enjoined, the Secretary of State's refusal to register voters based on an unlawful matching requirement will continue indefinitely to impose such severe burdens on the voters' right to vote, requiring Plaintiffs to divert resources in an attempt to remedy the deprivation. Subsection 6 is not narrowly drawn to advance any state interest of such compelling importance to justify the imposition of such severe burdens.

173.    Moreover, even if the burdens imposed by Subsection 6 were considered less than severe, the Secretary of State has no sufficient justification for the refusal to permit county election officials to register applicants despite the lack of a match.

174.    By reason of the foregoing, the Secretary of State, acting under color of state law, will deprive Plaintiffs and their members of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

175.    Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights, privileges, and immunities.

176.    No compelling or legitimate state interest justifies this severe and unequal burden upon Plaintiffs' and their members' fundamental right to vote and to participate in the political process.

55

## COUNT VIII

## (VIOLATION OF THE FOURTEENTH AMENDMENT
## TO THE U.S. CONSTITUTION: EQUAL PROTECTION)

177.    Plaintiffs repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.    Because Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, Subsection 6 burdens the fundamental right to vote by disenfranchising eligible voters.  Moreover, Subsection 6 imposes, without sufficient justification, different burdens on the right to vote of similarly situated eligible voters.

179.    If the Secretary of State is required to enforce the provisions set forth in Subsection 6, eligible Florida voters, including Plaintiffs' members, will be less likely than others to have their votes counted, based on the arbitrary distinction that they were the victim of errors beyond their control — such as faulty data entry, file maintenance, or file corruption — or that their registration applications contained nonmaterial errors or omissions.

180.    If the Secretary of State is required to enforce the provisions set forth in Subsection 6, eligible Florida voters, including Plaintiffs' members, will be less likely than others to have their votes counted, based solely on the arbitrary distinction of their

56

residence in different counties. Because Subsection 6 imposes no uniform standards regarding the content of the notices counties are required to provide unmatched applicants, some counties will provide notices that give applicants insufficient information to allow them to resolve the mismatch. Because Subsection 6 imposes no uniform standards regarding what information poll workers must provide, and must be able to provide, unmatched applicants who submit provisional ballots, some counties will give applicants insufficient information to allow them to ensure that their provisional ballots are counted. Further, because Subsection 6 imposes no uniform standards regarding the evidence that is sufficient to resolve mismatches, some counties will enforce stricter requirements than will other counties. Thus, the enforcement of Subsection 6 will lead inexorably to arbitrary and disparate refusal to register and disenfranchisement of voters in Florida's different counties.

181. If the Secretary of State is required to enforce the provisions set forth in Subsection 6, eligible Florida voters, including Plaintiffs' members, will be less likely than others to have their votes counted, based solely on the arbitrary distinction of whether they submit driver's license numbers or Social Security digits on their registration forms. The Social Security Administration has reported that it has failed to match 46% of voter registration records submitted. On information and belief, the failure rate for eligible Florida voters, including Plaintiffs' members, is substantially higher for those who submit Social Security digits than for those who submit driver's license numbers. Further, because the Social Security Administration provides no information regarding the basis for a failed match to the State, eligible Florida voters, including

57

Plaintiffs' members, who submit Social Security digits will face substantially more difficulty in resolving failed matches than will similarly situated voters who submit driver's license numbers. Thus, the enforcement of Subsection 6 will lead inexorably to arbitrary and disparate refusal to register and disenfranchisement of voters based solely on whether the voters have submitted Florida driver's license numbers or Social Security digits.

182. Racial, ethnic, and language minorities, including those with foreign-language surnames, are more likely to be disenfranchised as a direct result of Subsection 6, depriving them of the equal protection of HAVA and the laws of the United States as protected under 42 U.S.C. § 1983.

183. Defendant has no sufficient interest that justifies this arbitrary, unreasonable, and unequal burden upon Plaintiffs' and their members' fundamental rights.

184. Absent this Court's intervention, Plaintiffs, their members, and similarly situated voters will suffer irreparable injury through deprivation of the equal right to vote.

185. The enforcement of Subsection 6's instruction not to register otherwise eligible voters until a match is made, an identifying number is authenticated, or it is determined that the voter has no identifying number to be matched must be preliminarily and permanently enjoined to protect Plaintiffs and their members from this real and imminent threat.

186. Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights, privileges, and immunities.

58

## COUNT IX

### (VIOLATION OF THE FOURTEENTH AMENDMENT
### TO THE U.S. CONSTITUTION:  DUE PROCESS)

187.    Plaintiffs repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.    As detailed above, because Subsection 6 prevents an applicant from being included on the official list of registered voters until the Secretary of State has matched the driver's license number or Social Security digits on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, Florida has sanctioned a flawed voting process that will arbitrarily deny otherwise eligible voters the right to vote and have that vote counted.

189.    The process mandated by Subsection 6 will fail to provide sufficient and meaningful notice of actions and decisions affecting registration to many Florida residents and will fail to provide adequate or timely process for many Florida residents to challenge such actions and decisions.  This failure creates an unreasonably high risk that Plaintiffs' members and others will be erroneously denied the right to vote.

190.    Unless enjoined, Defendant will administer an election process that deprives eligible Florida residents, including Plaintiffs and their members, of their liberty interest in voting and does so without adequate pre- or post-deprivation process.

191.    By reason of the foregoing, Defendant, acting under color of state law, will deprive Plaintiffs and their members of the rights, privileges, and immunities secured

59

to them by state and federal law, and therefore protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

192. Defendant has no sufficient interest that justifies this severe and unequal burden upon Plaintiffs' and their members' fundamental right to vote and to participate in the political process without adequate process.

193. Plaintiffs and their members have no adequate remedy at law for such deprivation of their rights, privileges, and immunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court to enter an Order:

(1) Declaring that the provisions of § 97.053(6), Fla. Stat., as currently enacted and as amended effective January 1, 2008, prohibiting election officials from registering eligible voters until the Secretary of State has matched the driver's license number or Social Security number on the voter registration form with existing records of the DHSMV or SSA, the applicant has produced unspecified evidence deemed sufficient to authenticate the identifying number on the form, or it has been determined that the applicant has no such number, violate rights granted to Plaintiffs and their members by, and conflict with preempting provisions of, the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq.*, the Voting Rights Act, 42 U.S.C. §§ 1971(a)(2)(B) and 1973, the National Voter

60

Registration Act, 42 U.S.C. § 1973gg, and the First and Fourteenth Amendments to the United States Constitution;

(2)     Preliminarily and permanently enjoining Defendant, his employees, agents, representatives, and successors in office from refusing to place on the official statewide list of registered voters voter registration applicants solely because they cannot "verify the authenticity or nonexistence" of the applicants' identifying numbers;

(3)     Awarding Plaintiffs their attorneys' fees and costs in accordance with 42 U.S.C. § 1988; and

(4)     Granting Plaintiffs such additional relief as the interests of justice may require, together with their costs and disbursements in maintaining this action.

Dated:  September 17, 2007.

GREENBERG TRAURIG, P.A.

GLENN T. BURHANS, JR.
FLA. BAR NO. 605867
101 EAST COLLEGE AVENUE
TALLAHASSEE, FLORIDA 32301
TEL. (850) 222-6891
FAX (850) 681-0207

PAUL, WEISS, RIFKIND, WHARTON &
      GARRISON LLP
ROBERT A. ATKINS*
D. MARK CAVE*
J. ADAM SKAGGS*

61

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TEL. (212) 373-3000
FAX (212) 492-0289

**BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW**
JUSTIN LEVITT*
MYRNA PÉREZ*
WENDY R. WEISER*
161 AVENUE OF THE AMERICAS, 12TH FLOOR
NEW YORK, NEW YORK 10013
TEL. (212) 998-6730
FAX (212) 995-4550

**ADVANCEMENT PROJECT**
ELIZABETH S. WESTFALL*
JENNIFER MARANZANO*
1730 M. STREET, NW, SUITE 910
WASHINGTON, DC 20036
TEL. (202) 728-9557
FAX (202) 728-9558

**PROJECT VOTE**
BRIAN W. MELLOR*
196 ADAMS STREET
DORCHESTER, MA 02124
TEL. (617) 282-3666
FAX (617) 436-4878

*Counsel for Plaintiffs*

\* *Pro Hac Vice* application to be filed

*TAL 451433020v1 9/17/2007*

62