## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

FLORIDA STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), as an organization and representative
of its members; *et al.*,

Civil No. 4:07cv402 SP<sub>WN</sub>/WCS

Plaintiffs,

vs.

KURT S. BROWNING, in his official capacity as
Secretary of State for the State of Florida,

Defendant.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR PRELIMINARY INJUNCTION

OFFICE OF CLERK
U.S. DISTRICT OF
NORTHERN DIST. FLA.
GAINESVILLE, FLA.

2007 SEP 19  AM 9: 37

RECEIVED

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

   A.   Overview of Subsection 6 ................................................................................ 3

   B.   The Registration "Matching" Process .............................................................. 6

   C.   The Disproportionate Effect of Matching .......................................................... 7

   D.   The Other Barriers to Voting for Un-matched Applicants .................................. 8

THE COMPLAINT ....................................................................................................... 10

ARGUMENT .................................................................................................................. 11

I.    Plaintiffs Have a Strong Likelihood of Success on Their Statutory Claims .......... 11

   A.   Subsection 6 Conflicts With and Violates HAVA ......................................... 13

       1.   Subsection 6 Obstructs the Goals of Congress in Enacting
           HAVA's Computerized Statewide Registration List Provision ............. 14

       2.   Subsection 6 Makes It Impossible for Florida to Comply with
           HAVA's Identification Provisions ....................................................... 16

       3.   Subsection 6 Frustrates HAVA's Provisional Ballot Requirement ........ 17

   B.   Subsection 6 Conflicts With and Violates the Voting Rights Act .................. 18

II.   Plaintiffs Are Likely to Succeed on Their Constitutional Claims .......................... 20

   A.   Subsection 6 Imposes a Severe Burden on Plaintiffs' First and
       Fourteenth Amendment Voting Rights ........................................................... 20

   B.   Subsection 6 Is Not Justified By Any Sufficient State Interest ...................... 22

   C.   Subsection 6 Violates Plaintiffs' Equal Protection Rights ............................ 233

III.  Plaintiffs Meet the Other Requirements for a Preliminary Injunction ................... 24

   A.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ....................... 24

   B.   The Balance of Hardships Clearly Falls in Plaintiffs' Favor .......................... 24

   C.   The Public Interest Mandates a Grant of Injunctive Relief ............................ 25

CONCLUSION ............................................................................................................... 25

GREENBERG TRAURIG, P.A.

## TABLE OF AUTHORITIES

### CASES

*Bishop* v. *Lomenzo*, 350 F. Supp. 576 (E.D.N.Y. 1972)......................................................20

*Bullock* v. *Carter*, 405 U.S. 134 (1972)...............................................................................23

*Burdick* v. *Takushi*, 504 U.S. 428 (1992) ..............................................................20, 21, 22

*Bush* v. *Gore*, 531 U.S. 98 (2000)........................................................................................23

*Carrington* v. *Rash*, 380 U.S. 89 (1965)..............................................................................23

*Charles H. Wesley Educ. Fdn., Inc.* v. *Cox*, 408 F.3d 1349 (11th Cir. 2005) ....................25

*Condon* v. *Reno*, 913 F. Supp. 946 (D.S.C. 1995)..........................................................19, 20

*Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)...........................................12

*Dunn* v. *Blumstein*, 405 U.S. 330 (1972)..............................................................................20

*Felder* v. *Casey*, 487 U.S. 131 (1988) .................................................................................13

*Friedman* v. *Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004)..............................................19

*Gibbons* v. *Ogden*, 22 U.S. (9 Wheat) 1 (1824) ..................................................................12

*Irving* v. *Mazda Motor Corp.*, 136 F.3d 764 (11th Cir. 1998).............................................13

*Maine* v. *Thiboutot*, 448 U.S. 1 (1980).................................................................................12

*McLaughlin* v. *N.C. Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995) ...................................22

*New Alliance Party* v. *Hand*, 933 F.2d 1568 (11th Cir. 1991) .............................................22

*O'Brien* v. *Skinner*, 414 U.S. 524 (1974)..............................................................................23

*Pharm. Research & Mfrs. of Am.* v. *Meadows*, 304 F.3d 1197 (11th Cir. 2002) ..............12

*Reform Party of Allegheny County* v. *Allegheny County Dep't of Elections*,
174 F.3d 305 (3d Cir. 1999)......................................................................................22

*Sandusky County Democratic Party* v. *Blackwell*, 387 F.3d 565 (6th Cir. 2004) ..............12

*Schiavo ex rel. Schindler* v. *Schiavo*, 403 F.3d 1223 (11th Cir. 2005)...............................11

*Schwier* v. *Cox*, 340 F.3d 1284 (11th Cir. 2003) .................................................................12

**GREENBERG TRAURIG, P.A.**

*Schwier* v. *Cox*, 439 F.3d 1285 (11th Cir. 2006) ...................................................................18

*Siegel* v. *LePore*, 234 F.3d 1163 (11th Cir. 2000)..................................................................20

*Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208 (1986)............................................21

*Touchston* v. *McDermott*, 234 F.3d 1133 (11th Cir. 2000) ..................................................24

*United States* v. *McLeod*, 385 F.2d 734 (5th Cir. 1967).......................................................20

*Wash. Ass'n of Churches* v. *Reed*, 492 F. Supp. 2d 1264
(W.D. Wash. 2006) ........................................................................................... *passim*

*Wisconsin Pub. Intervenor* v. *Mortier*, 501 U.S. 597 (1991).............................................12

*Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886) .........................................................................20

## CONSTITUTIONAL, STATUTORY & LEGISLATIVE MATERIALS

§ 97.053(6), Fla. Stat...................................................................................................... *passim*

§ 101.043, Fla. Stat. ..............................................................................................................5

§ 101.048(2), Fla. Stat...........................................................................................................10

§ 101.048(5), Fla. Stat...........................................................................................................10

42 U.S.C. § 1971............................................................................................................ *passim*

42 U.S.C. § 1983....................................................................................................................12

148 Cong. Rec. S10488-02, .............................................................................................16, 17

2007 Fla. Sess. Law Serv. Ch. 2007-30 (C.S.H.B. 537)........................................................4

2007 N.C. Sess. Laws 391 ....................................................................................................14

Art. VI, §§ 2, 4, Fla. Const...........................................................................................4, 5, 19

Fed. R. Civ. P. 65............................................................................................................11, 25

Help America Vote Act, 42 U.S.C. § 15301 *et seq* ...................................................... *passim*

H.R. Rep. 107-329(I) (2001)................................................................................................16

iii

## PRELIMINARY STATEMENT

This motion is brought to enjoin the enforcement of a Florida election law that erects an illegal bureaucratic barrier to voting. Absent a preliminary injunction, thousands of eligible citizens will be disenfranchised during the 2008 election cycle, in violation of Plaintiffs' voting rights. There is no other remedy for the deprivation of a right so fundamental to American citizenship.

This law, Subsection 6 of Section 97.053 of the Florida Statutes ("Subsection 6"), blocks eligible voters from registering and voting unless the Secretary of State (the "Secretary") has matched the driver's license number or Social Security number on their registration form with error-filled government databases, or the voters otherwise verify their numbers. The Secretary must compare that number, plus the applicant's first and last name, with the existing motor vehicle or Social Security records. There will often be no "match" because, for example, one digit is out of place or a name has been changed. Such un-matched applicants will not be allowed to register or vote unless they somehow learn that they have been rejected, somehow identify the glitch in the matching process, and somehow "verify the authenticity" of the number on their registration form.

This new registration and voting requirement — which has nothing to do with either the eligibility or identity of the prospective voter — was adopted by Florida in a misguided attempt to comply with the Help America Vote Act of 2002 ("HAVA"), passed in the aftermath of the 2000 Presidential Election. Congress's goal was to *eliminate* barriers to voting. HAVA requires the states to create dependable, computerized voter registration lists to protect voters from being turned away from the polls when their names cannot be found on shoddy and outdated lists. As part of that

1

record keeping assignment, states must assign each registered voter a unique identification number — preferably a driver's license or Social Security number — in order to locate the voter more easily if she moves towns and registers once again. Only Florida and a few other states have made "matching" and verification of that number a prerequisite to voting. Because such a "no match/no vote" requirement actually violates HAVA, as well as the Voting Rights Act, a similar statue in Washington State was declared unlawful and enjoined last year. *See Wash. Ass'n of Churches* v. *Reed,* 492 F. Supp. 2d 1264 (W.D. Wash. 2006) ("*Reed*").

Matching information from one database with information in another database is an unreliable and error-prone process riddled with mistakes. Registration information provided by voters will fail to "match" other government records because of meaningless spelling differences, name changes, misplaced numbers, typos and data entry errors — none of which have any relation to the voters' identity or eligibility to vote.

Recognizing that automated matching does not work, Florida has tried to minimize the inevitable deprivation of voting rights by purporting to give un-matched applicants an opportunity to present "evidence . . . sufficient to verify the authenticity of the number provided on the application." § 97.053(6), Fla. Stat. But this only imposes further obstacles to voting. If an un-matched voter goes to the polls on Election Day, she will only be given a "provisional ballot," not a regular ballot. That ballot will *not* be counted unless the un-matched voter is able to get herself to the offices of county election officials within the next two days — effectively being required to vote twice in one week — and present proof to verify the number on her application. Proof of her identity or her

2

eligibility to vote will not suffice. If a perfectly eligible voter inadvertently makes a trivial error on her application — like miswriting one of the 13 digits in her driver's license number — there is no evidence she can submit that will "verify" that number and her vote will not be counted.

This elevation of forms over substance will do real and irreparable harm to the franchise. In 2006, more than 20,000 Floridians found their registration applications unduly delayed or denied because of matching problems. In Washington State, the failure rate averaged 16% and was 30% in the largest county. As of February 2007, the Social Security Administration failed to successfully match 46.2% — nearly half — of the 2.6 million voter registration records submitted from around the country.

Rather than facilitating the exercise of the franchise, as Federal law and the Constitution require, Florida has set up an illegal roadblock to voting. Subsection 6 undermines HAVA, conflicts with the Voting Rights Act, and violates the Constitution. Plaintiffs are more than likely to succeed on the merits of these claims and will be irreparably harmed if a preliminary injunction is not granted.

## STATEMENT OF FACTS

Plaintiffs are (1) organizations whose members include eligible but unregistered Florida voters who will attempt to register to vote in the 2008 federal elections, but will be omitted from the official list of registered voters and will be unable to cast a valid vote, and (2) organizations that seek to register voters and to reduce barriers to fair and efficient voting whose missions will be frustrated by Subsection 6.

### A. Overview of Subsection 6

Subsection 6 will govern registration and voting in all the 2008 Federal elections,

3

including the presidential primaries on January 29, 2008. *See* 2007 Fla. Sess. Law Serv. Ch. 2007-30 (C.S.H.B. 537). The deadline to register for those primaries (the "book closing" date) is December 31, 2007. *See* Burhans Decl. Ex. C.

Under Subsection 6, applicants who meet all eligibility requirements under Florida law will not be registered to vote unless the Secretary matches their registration information with information in an existing government database or otherwise verifies the identifying number provided by the applicant. *See* Fla. Stat. § 97.053(6).[1]

The Secretary must attempt to "match" information on the registration form — the driver's license number or Social Security digits and the first and last name — with records maintained by the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") or the U.S. Social Security Administration ("SSA"). *See id.*[2] If the application is not successfully "matched" for whatever reason — including typos, data entry errors, changes from maiden to married names, spelling differences, inverted digits, use of nicknames, etc. — the application is deemed "incomplete."[3]

County supervisors must try to send a notice to un-matched applicants informing them that their applications are "incomplete," and that they may provide evidence

---

[1] A Florida resident is eligible to register and vote if she is a United States citizen; at least 18 years old; a legal resident of Florida; and has not been convicted of a felony or adjudicated mentally incapacitated with respect to voting (or, if so, if she has had her right to vote restored). *See* Art. VI, §§ 2, 4, Fla. Const.

[2] References in this motion to driver's licenses and driver's license numbers apply equally to Florida identification cards and Florida identification card numbers, as if fully set forth in each such reference.

[3] If the names do not match exactly, but the first 4 characters of the first and last name do match exactly, the application may be treated as a "possible match" and sent for further human review to determine if a match can be established.

4

"sufficient to verify the authenticity of the number provided on the application." *Id*.

If the un-matched applicant has not been contacted and/or has not presented such evidence before election day, she will not be placed on the registration rolls as a registered voter, and will not be permitted to cast a regular ballot, even if she is otherwise eligible, even if she arrives at the polls with the photo identification required by Florida law, and even if her signature matches the signature on that identification as required by Florida law. *See id.* § 101.043.[4]

Instead, the un-matched applicant will only be offered a "provisional ballot," which will not be counted unless, within two days of the election, she travels to the offices of the county election supervisor and presents evidence sufficient to verify the number on her registration form. § 97.053(6), Fla. Stat. Despite the notice she must be given, *id.* § 101.048(5) ("Each person casting a provisional ballot shall be given written instructions regarding the person's right to provide the supervisor of elections with written evidence of his or her *eligibility* to vote . . . .") (emphasis added), verification of her eligibility to vote will not work. Verification of the *number* on her registration form is all that counts in deciding whether to count her ballot. *See id.* § 97.053(6).

The only evidence "sufficient to verify the authenticity" of the driver's license number or Social Security digits is the driver's license or Social Security card itself. *See* Burhans Decl., Ex. D at 2. Thus, even if an applicant who submitted her Social Security digits presents various proofs of identity and eligibility — say, a U.S. passport or

---

[4] Florida requires in-person voters to present one of various forms of photo identification at the polls. *See* § 101.043, Fla. Stat. Voters lacking photo ID are issued a provisional ballot, which is counted if the signature on the provisional ballot affidavit matches the signature in the registration book. *See id.* § 101.043(2).

5

government-issued ID — she will not be registered and her provisional ballot will not count if she does not provide her Social Security card. Moreover, if an applicant dropped a digit from her driver's license number or inverted two digits when filling out her application, she will not be registered or have her vote counted, because there is no evidence that she can show to "verify" that number.

## B. The Registration "Matching" Process

This process is fraught with problems. Troubles begin with Subsection 6's very first step: data entry of the information on a registration form, and the attempt to "match" that information with other government databases. As set forth in the accompanying declaration of Dr. Andrew Borthwick, a leading expert in data matching, many of these attempted matches will fail, and many of those failed matches will be "false negatives." That is when two records appear not to relate to the same person but, in fact, do — *e.g.*, a registration form for Bill Clinton and a driver's license for William Clinton. *See* Borthwick Declaration ¶ 10.

As Dr. Borthwick explains, and as illustrated by the examples set forth in the attached Appendix, the reasons for these false negatives are legion, and have nothing to do with the identity or eligibility of applicants. For example, data entry operators make mistakes when they input information, including simple typos and other innocent errors, like erroneously splitting a compound last name into a middle and last name. *See id.* ¶¶ 22-23.[5] In other cases, because of discrepancies between databases, false negatives will

---

[5] Data entry errors are common. One study found that as many as 26% of records listed in a Florida social service database included misspelled city names, including 40 spelling variations of Fort Lauderdale. *See* Borthwick Declaration ¶ 25 & Ex. J. Other studies contain similar findings. *See id.* ¶¶ 25-27. Similar data entry errors are

6

occur even where the original data was inputted correctly — *e.g.*, the use of a married name in one database and a maiden name in the other. *See id.* ¶¶ 34-38. These and other ordinary data discrepancies are commonplace, and under Florida's system, will prevent the records of eligible voters from being matched. *Id.* ¶ 5.

Experience in other states demonstrates that the error rate in Florida will be substantial. In the first six months of 2006, and before its "no match/no vote" law was enjoined, Washington had a failed match rate of 16% statewide, and up to 30% in King County, which includes Seattle. *See id.* ¶ 47. Through April of 2006, before California changed its "no match/no vote" policy, 18% of applications in Los Angeles County failed to "match." *See* McCormack Decl. ¶ 13. Nearly 20% of an audit sample of 15,000 applications submitted in New York City in September 2004 could not be matched due to typos and other data entry errors. *See* Borthwick Decl. ¶ 12 & Ex. F.

The Social Security Administration recently reported that of 2.6 million voter registration records submitted to the SSA through February 2007, 46.2% resulted in a failed match. *See id.* ¶ 50 & Ex. E. Thus, using the same matching system that Florida uses, the SSA failed to match *nearly half* of all voter registration applications.

## C. The Disproportionate Effect of Matching

False negatives often arise when attempting to match the names of members of certain racial and ethnic groups. *See* Borthwick Decl. ¶¶ 39-44. This is an issue of particular importance to states like Florida with large minority populations. Latino and

associated with Social Security numbers. The leading expert on record matching for the U.S. Census Bureau estimates that in one large California employment database, for example, "the records [associated] with each individual can be expected to contain at least two errors where the [Social Security number] has been mis-keyed or transcribed improperly." *Id.* ¶ 27 & Ex. K.

7

Haitian citizens, for example, are particularly susceptible to typical matching errors: improper separation and combination of fields is common with regard to Latinos, many of whom use both maternal and paternal last names, and in the names of Haitians, many of whom hyphenate their first two names (*e.g.*, "Jean-Bertrand"). *See id.* ¶ 39.

Other kinds of errors also have a disproportionate effect on certain populations. Incorrect spellings of unique names, or of derivatives of common names, are particularly prevalent in the African-American community. *See id.* ¶ 40. Mismatched transliterated names are more common in communities whose primary language does not use the Roman alphabet or uses diacritical marks. Transposed date and month of birth is more common with regard to recent immigrants, who may present dates in the day-month-year configuration. And mismatched surnames due to a maiden name or married name are more common with regard to women. *Id.* ¶¶ 42-44.

## D. The Other Barriers to Voting for Un-Matched Applicants

Voters whose registration applications have been rejected due to a failed match face a maze of bureaucratic obstacles and evidentiary hurdles that will prevent many from ever registering or voting. Subsection 6 purports to give un-matched applicants — if they know there is a problem and if they know how to fix it — a chance to verify the number on their form. In reality, this is just another unjustified — and often insurmountable — burden on the right to vote.

*First*, the notice sought to be given to un-matched applicants can be misleading and uninstructive. As of January 1, 2008, the notice must inform un-matched, rejected voters that their application are "incomplete," § 97.053(6), Fla. Stat., and instruct them to supply the "missing" information on a new registration application, *see id.* § 97.073(1).

8

This is true even if the application was accurate and complete, but the number could not be "verified" because of a failed match. For those who receive and respond to such a notice by submitting a new registration with the same accurate information, they will only be rejected again when the information fails to match again. Moreover, absent a uniform statewide rule, interpretations and implementation of this mandate will vary from county to county. *See, e.g.*, Burhans Decl. Ex. H.

*Second,* election officials will have difficulty making contact with every un-matched applicant. The very same mistakes in personal data that result in failed matches will result in mistakes in contact information. *See* McCormack Decl. ¶ 15.

*Third*, for many un-matched applicants, the notice (if it comes) will not be timely. Registration forms typically flood in during the final week before the registration deadline. *See id.* ¶¶ 16-17. In the last five Presidential elections, Florida logged between 7 and 19 percent of the total annual registrations in the final week before book closing. *See* Burhans Decl. Ex. E. The number of failed matches will thus skyrocket at the last minute, potentially overwhelming the Secretary and county supervisors precisely when there is no time for error.

*Fourth*, even among those who timely receive, read and understand the notice, many un-matched applicants will not be able to meet the evidentiary burden imposed by Subsection 6 because they will not know what the problem is or how to fix it in time to vote. When Social Security numbers fail to match, for example, all the State and the applicant are told is that there is "no match." *See* Borthwick Decl. Ex. B at 27. Since no explanation of the problem is given, there is no way to know the solution. The U.S.

9

Government Accountability Office ("GAO") reported that in "matching" Social Security numbers, "the biggest problem [state officials] are facing is that SSA is not specifying what voter information was not matching (*i.e.*, was the mismatch in name, date of birth, or 4-digit Social Security number). Without this information they are not able to efficiently resolve the non-matching problems." *See* Burhans Ex. F at 36.

*Finally*, when Election Day arrives, un-matched applicants are permitted to vote a "provisional ballot" — but it will not count unless, within two days, the voter travels to the county supervisor's offices and presents "sufficient" evidence to "verify" the number on her application. *See* § 97.053(6), Fla. Stat. This will put the franchise out of reach for many of these eligible Florida citizens. Many will not be able to set aside family and employment obligations to make an unplanned and unscheduled trip to the county seat or office during the same work week they took time to travel to the polls. Even those who can go out of their way will be misled by a notice that implies that they may provide evidence of their *eligibility* when the only evidence that matters concerns the *number* on the form. *See* § 101.048(5), Fla. Stat. Even if every poll worker fully and accurately explains to every un-matched applicant what documentation is "sufficient" evidence to verify the number — an assumption that defies experience — many of the eligible voters will not have or be able to locate in two days the required evidence (*e.g.*, their actual Social Security card). And if the driver's license or Social Security number was written incorrectly in the first place, that errant number cannot be verified and the un-matched voter's ballot will be marked "Rejected as Illegal." § 101.048(2)(b)(2), Fla. Stat.

## THE COMPLAINT

Plaintiffs filed and served their Complaint this day, seeking a declaration that

10

Subsection 6 violates and is preempted by HAVA, the Voting Rights Act ("VRA"), and the National Voter Registration Act ("NVRA"), and also violates the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs move here on their claims under HAVA (Counts I-III), the materiality provision of the VRA (Count IV), and the Constitution (Counts VII-VIII), except for their due process claim.

## ARGUMENT

A party seeking a preliminary injunction under Fed. R. Civ. P. 65 must show that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Schiavo ex rel. Schindler* v. *Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).

## I. Plaintiffs Have a Strong Likelihood of Success on Their Statutory Claims

Plaintiffs are likely to succeed on their claims that Subsection 6 violates and is preempted by HAVA, 42 U.S.C. § 15301 *et seq.*, and the materiality provision of the VRA, 42 U.S.C. § 1971(a)(2)(B). HAVA requires states to create voter registration databases so that eligible voters are *not* disenfranchised due to administrative errors; the VRA prohibits states from disenfranchising voters on the basis of immaterial errors in registration. As was the case with the Washington statute invalidated in *Reed*, Subsection 6 contravenes those federal laws by preventing eligible voters from registering based on immaterial administrative errors and inconsistencies in the process of confirming a record keeping number. *See Wash. Ass'n of Churches* v. *Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006); *id.*, Final Judgment and Order (March 16, 2007) (Burhans Decl. Ex. G).

11

Federal law provides a private right of action against persons who, acting under the color of law, cause the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 provides a means to vindicate not only violations of constitutional rights, but also violations of rights created by federal statutes, *see Maine* v. *Thiboutot*, 448 U.S. 1, 7-8 (1980), including rights guaranteed by HAVA, *see Sandusky County Democratic Party* v. *Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004), and the VRA, *see Schwier* v. *Cox*, 340 F.3d 1284, 1296-97 (11th Cir. 2003).

The Supremacy Clause provides an independent basis for Plaintiffs' claims. Due to the conflicts with HAVA and the VRA, Subsection 6 is preempted by federal law. "[S]tate laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wisconsin Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat) 1 (1824)). Even in an area of traditional state regulation, Congress may preempt state law by occupying a legislative field through pervasive federal regulation or through what is called "conflict preemption." *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "Implied conflict preemption occurs when (a) compliance with both federal and state regulations is a physical impossibility, or (b) when a state law is an obstacle to execution and accomplishment of the objectives and purpose of a Congressional enactment." *Pharm. Research & Mfrs. of Am.* v. *Meadows*, 304 F.3d 1197, 1206 (11th Cir. 2002).

"Under the Supremacy Clause of the Federal Constitution . . . any state law, however clearly within a State's acknowledged power, which interferes with or is

12

contrary to federal law, must yield." *Felder* v. *Casey*, 487 U.S. 131, 138 (1988) (quotation marks omitted). Thus, as here, a state law runs afoul of the Supremacy Clause and is preempted where it "hinder[s] Congress's objectives" in passing an Act. *Irving* v. *Mazda Motor Corp.,* 136 F.3d 764, 768 (11th Cir. 1998) (citations omitted).

## A. Subsection 6 Conflicts With and Violates HAVA

As in *Reed*, Subsection 6 prevents eligible voters from registering and voting unless the Secretary matches or somehow verifies the numbers on their registration forms. And as in *Reed*, Plaintiffs have a strong likelihood of success on their claim that Subsection 6 violates, directly conflicts with, and is preempted by HAVA.

HAVA was passed in the wake of the 2000 Presidential Election, in large part to ensure that eligible voters would not be left off the voting rolls by mandating certain uniform practices aimed at eliminating bureaucratic barriers to voting. It requires states to attempt to match numbers provided by applicants not as a new eligibility requirement, but to facilitate orderly record keeping: one unique number for each voter. Under HAVA, voters need *not* be successfully matched in order to register and vote: new voters without a driver's license or Social Security number, and all of the existing voters on the rolls, are simply assigned a unique number by the state.

As demonstrated below, no provision of HAVA permits a voter to be disenfranchised if the "match" should fail or the voter's record keeping number is not "verified." In all but a handful of outlier states, matching and number verification are *not* preconditions to voting. And various states that initially misinterpreted HAVA by making such verification a precondition to registration have since changed their laws,

13

either voluntarily[6] or because of court order. *Reed*, 492 F. Supp. 2d at 1271; Burhans Decl., Ex. G.

## 1. Subsection 6 Obstructs the Goals of Congress in Enacting HAVA's Computerized Statewide Registration List Provision

HAVA seeks to reduce the burdens on voting caused by sloppy and incomplete voter registration lists. For decades, voters have been turned away from the polls or discouraged from voting due to neglected and poorly maintained voter registration lists. To remove this bureaucratic barrier to voting, Section 303(a) of HAVA ("Section 303(a)"), 42 U.S.C. § 15483(a), requires each state to implement a "single, uniform, official, centralized, interactive computerized statewide voter registration list" that is required to be "the single system for storing and managing the official list of registered voters throughout the State." *Id.* § 15483(a)(1)(A) and (i).

To facilitate the orderly maintenance of the new registration lists, Congress required states to "assign[ ] a unique identifier to each legally registered voter in the State." *Id.* § 15483(a)(1)(A). These unique identifiers help states keep track of voters who move and re-register in a new location, and reduce the possibility of duplicates. The easiest approach is to use an identifier that the individual already has. Therefore, HAVA states that an applicant for registration must provide her driver's license number, or if she has none, the last four digits of her Social Security number. *Id.* § 15483(a)(5)(A)(i)(I) and (II). Applicants without either are simply assigned a number, and are registered and permitted to vote without any further effort. *Id.* § 15483(a)(5)(A)(ii).

---

[6] *See, e.g.*, 2007 N.C. Sess. Laws 391 (amending N.C. Gen. Stat. § 163-166.12) ("the failure of identification numbers to match shall not prevent that individual from registering to vote and having that individual's vote counted").

14

HAVA also directs states to attempt to "match" the number provided by a voter with records in other state databases, to ensure confidence that the numbers are accurately assigned; otherwise, in the event of a mistake, two records might end up labeled with the same "unique" number. *Id.* § 15483(a)(5)(B)(i).

This "matching" provision was intended as an administrative safeguard for "storing and managing the official list of registered voters," and *not* as a restriction on voter eligibility. *See id.* § 15483(a)(1)(A)(i). That is why HAVA was written. It imposes an administrative function on the states: "a unique identifier is assigned to each legally registered voter in the State." *Id.* § 15483(a)(1)(A)(iii). It does not, however, provide that the unique identifier must be verified before a voter can be legally registered.

If the number provided by an eligible voter cannot be verified, the correct consequence is to assign the voter a different unique number, not to reject the registration. Thus, new registrants with no driver's license or Social Security number are simply assigned a unique number and placed on the computerized list of registered voters, without any subsequent "matching." *Id.* § 15483(a)(5)(A)(ii). As the court in *Reed* explained, it is the assignment of a unique identifying number to each new voter — not the match or verification of the number provided on an application — that is required under Section 303(a): "HAVA's matching requirement was intended as an administrative safeguard for 'storing and managing the official list of registered voters,' and not as a restriction on voter eligibility." 492 F. Supp. 2d at 1268.

"Legislative history confirms that it is the assignment of some kind of unique identifying number to the voter that is the requirement of § 15483(a)(1)(A)(i), not the

15

'match.'" *Id.* at 1268-69. Senator Bond, the chief Senate Republican sponsor of HAVA, explained that a unique identifying number is assigned to each new registrant to create dependable lists, not to impose an obstacle to registering or voting:

The conferees agree that a unique identification number attributed to each registered voter will be an extremely *useful tool for State and local election officials in managing and maintaining clean and accurate voter lists*. It is the agreement of the conferees that election officials must have such a tool.

148 Cong. Rec. S10488-02, \*S10490 (daily ed. Oct. 16, 2002) (emphasis added); *see also* H.R. Rep. 107-329(I), at 36 (2001) (unique identifier "will be used to assure that list maintenance functions are attributed to the correct voter"). Because Subsection 6 makes the matching or verification of a record keeping number a new precondition to voting and registration, it obstructs Congress's goals in enacting HAVA's statewide registration list provision, Section 303(a), and is therefore preempted.

## 2. Subsection 6 Makes It Impossible for Florida to Comply with HAVA's Identification Provisions

In addition to its record keeping function, verifying the number on a registration form has another purpose under HAVA that proves it was not intended to be a precondition to registration. Under Section 303(b) of HAVA ("Section 303(b)"), 42 U.S.C. § 15483(b), confirming the number provides an alternative means of verifying the identity of certain voters: first-time voters who register by mail. Subsection 6, however, makes it impossible for the State to comply with the identification provisions of Section 303(b), and therefore is preempted by HAVA.

Section 303(b) requires that in all Federal elections, a first-time voter who registers by mail must verify her identity before voting a regular ballot. She may do so

16

by showing some form of identification. *See* 42 U.S.C. § 15483(b)(2)(A), (3)(A). *Or* her identity may be verified if the number on her registration application has been matched to an existing state record — in which case she need not show documentary identification. *Id.* § 15483(b)(3)(B).

In other words, matching "serves as a substitute for voter ID." *Reed*, 492 F. Supp. 2d at 1269. Congress understood that some of these voters will not be matched — but still can cast a regular ballot by showing their ID. For those who do match, no ID is required. As Senator Bond put it, "*[i]n lieu of* the individual providing proof of identity, States may also electronically verify an individual's identity against existing State databases." 148 Cong. Rec. S10488-02, *S10489 (daily ed. Oct. 16, 2002) (emphasis added). If Congress intended that every voter be matched as a prerequisite to registration, the ID provision would make no sense and would be superfluous. By denying voters whose identifying number has not been confirmed any opportunity to register and cast a regular ballot, Subsection 6 violates the rights of first-time voters who register by mail.

## 3.    **Subsection 6 Frustrates HAVA's Provisional Ballot Requirement**

Even if a first-time voter who registers by mail is not matched and does not present identification, HAVA gives her the right to vote a "provisional ballot" if she affirms that she is registered and is eligible. *See* 42 U.S.C. §§ 15483(b)(2)(B), 15482(a)(2). That ballot must be counted "[i]f the appropriate State or local election official . . . determines that the individual is eligible under State law to vote." *Id.* § 15482(a)(4).

This is Congress's "Fail-safe voting" provision: for a first-time voter registering

17

by mail and without identification, if the number on her form has not been verified, she may still fall back on a provisional ballot. *See id.* 15483(b)(2)(B). The voter need not, as Subsection 6 requires, travel to the county elections office after election day. The voter need not, as Subsection 6 requires, present evidence to "verify" the number on her registration application. Subsection 6 thereby undermines this "Fail-safe voting" mechanism. It recognizes that Congress gave voters with unverified numbers the right to cast a provisional ballot, but then sabotages that right by requiring those voters to verify their numbers. As the court held in *Reed*, HAVA's "Fail-safe voting" provision "would be rendered moot if matching was a prerequisite to registering." 492 F. Supp. 2d at 1269. Florida's rule would thus frustrate Congressional intent completely.

## B. Subsection 6 Conflicts With and Violates the Voting Rights Act

In *Reed*, the court concluded that Washington's matching law was "in direct conflict with the 'materiality' provision of section 1971 of the Voting Rights Act" because it prevented voters from registering based on minor errors immaterial to determining whether an applicant was qualified to vote under Washington law. 492 F. Supp. 2d at 1270-71; *accord Schwier* v. *Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (holding that the omission of the applicant's full Social Security number on a registration form "is not 'material' to a voter registration system under § 1971(a)(2)(B) of the Voting Rights Act."). For the same reason, Subsection 6 violates, conflicts with, and is preempted by the VRA.

Section 1971 of the VRA provides that

No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act

18

requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

42 U.S.C. § 1971(a)(2)(B). This section of the law, "often referred to as 'the materiality provision,' was designed to eliminate practices that could encumber an individual's ability to *register* to vote." *Friedman* v. *Snipes*, 345 F. Supp. 2d 1356, 1370-71 (S.D. Fla. 2004) (citation omitted). Congress adopted the materiality provision specifically "to deal with the problem of registering as a deterrent to voting." *Condon* v. *Reno*, 913 F. Supp. 946, 949-50 (D.S.C. 1995).

Subsection 6, which turns an error or omission that prevents the Secretary from verifying the number on the form into an absolute bar to registration, is just such a practice. Given the likelihood of false negatives, a matching failure is not material in determining whether an applicant is a U.S. citizen; whether she is at least 18 years old; whether she is a permanent resident of the state; or whether she has been convicted of a felony or adjudicated mentally incompetent without restoration of her voting rights. Under Florida's Constitution, only these factors bear on an individual's qualification to vote. Art. VI, §§ 2, 4, Fla. Const.

Indeed, for some voters, Subsection 6 stands the materiality provision on its head, using a trivial error on a form to deny the applicant her ability to register despite material evidence that she is qualified under Florida law. A voter who transposes two digits of her driver's license number, for example, will not be able to verify the authenticity of the number on her form under Subsection 6, through matching or otherwise. At the book-closing deadline, this immaterial error will block her registration, no matter how much evidence of citizenship, age, and residence she can muster.

19

HAVA requires the states to attempt to collect and verify a unique identification number for each new voter, to reduce the chance that eligible voters will be turned away from the polls. Converting that franchise-protecting administrative task into a substantive precondition on registration is a perversion of HAVA and a clear violation of the VRA.

## II. Plaintiffs Are Likely to Succeed on Their Constitutional Claims

The First and Fourteenth Amendments to the U.S. Constitution protect the right to vote as a fundamental right. *See, e.g.*, *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992) ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'") (citation omitted); *see also Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886); *Siegel* v. *LePore*, 234 F.3d 1163 (11th Cir. 2000). The right to vote extends to all phases of the voting process, including registration. *See United States* v. *McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) ("The right to vote encompasses the right to register."); *Condon*, 913 F. Supp. at 949 ("[R]egistration, rather than being simply a mechanism to facilitate orderly elections, [may be] in fact a significant barrier to voting."); *Bishop* v. *Lomenzo*, 350 F. Supp. 576, 587 (E.D.N.Y. 1972) ("The state may not deny a voter the right to register (and hence to vote) because of clerical deficiencies.").

### A. Subsection 6 Severely Burdens Plaintiffs' Constitutional Voting Rights

Laws that deny the franchise to eligible voters must be narrowly tailored to advance a compelling state interest. *See Dunn* v. *Blumstein*, 405 U.S. 330, 337 (1972). Even when assessing regulations that impact the right to vote only indirectly — *e.g.*, restrictions on candidates' ballot access — the Supreme Court has made clear that courts must apply strict scrutiny when the challenged practices impose severe burdens on voting rights. *See Burdick*, 504 U.S. at 434. Although "the State's important regulatory

20

interests are generally sufficient to justify" "reasonable nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters," when voters' rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.*

Subsection 6 falls in the latter category. For voters with an error in the number on the form itself, or those who do not receive timely notice of a problem, Subsection 6 imposes the severest of burdens: complete denial of the right to vote. Other unmatched voters are severely burdened as well. To overcome an error in the verification process not of their own making, they must: 1) make sense of a misleading and uninformative notice that their registration is "incomplete"; 2) understand the operation of an undisclosed and unexplained "matching" process; 3) diagnose and attempt to cure a problem of uncertain origin in that process; 4) vote a provisional ballot; 5) puzzle through a second misleading and uninformative notice; 6) take a second day the same week to travel to the county supervisor; and 7) proffer the original card with the number.

These burdens severely impair not only the fundamental voting rights of Plaintiffs' members, but also Plaintiffs' own rights of expression and association under the First and Fourteenth Amendments. When Plaintiffs' constituents are disenfranchised, they lose the concomitant strength in advocating in the political arena for their policy priorities. *Cf. Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208, 214 (1986).

Because these burdens are severe, they must be narrowly tailored to a compelling state interest. But even if the burden of Subsection 6 were considered less than severe, it would not relieve the State of its obligation to offer a justification that outweighed those

21

burdens. The assessment of any election regulation requires a *balancing* of the interest of voters against the "precise interests put forward by the State" and an evaluation of "the extent to which those interests make it *necessary* to burden the plaintiffs' rights." *Burdick*, 504 U.S. at 434 (emphasis added). This is no mere recital of the deferential "rational basis" test applied to economic legislation. *See, e.g.*, *Reform Party of Allegheny County* v. *Allegheny County Dep't of Elections*, 174 F.3d 305, 315 (3d Cir. 1999) (en banc) (applying this "intermediate level of scrutiny"). Regulations that are not sufficiently justified by the interests advanced to support them will be struck down.[7]

## B. Subsection 6 Is Not Justified By Any Sufficient State Interest

There is no interest in confirming the number written on a registration form sufficient to justify the undue hurdles or outright disenfranchisement described above, particularly for voters who already have to produce evidence of identity and eligibility at the polls. The interest in maintaining an orderly registry, even if important, is surely insufficient to justify barring eligible voters from those rolls. Moreover, by excluding eligible voters, Subsection 6 forces the State to compromise the integrity of its elections. Nor can the State claim that HAVA has compelled it to adopt Subsection 6; as shown above, the statute conflicts with HAVA and stands as an obstacle to HAVA's purposes. Since no interest justifies the burden of Subsection 6, it must be enjoined.

---

[7] *See New Alliance Party* v. *Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991) ("Although the Court finds that the burden imposed . . . is not insurmountable, the Court determines that plaintiffs are due to be granted the relief requested because the interests put forth by the defendant do not adequately justify the restriction imposed."); *McLaughlin* v. *N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995) ("[a] regulation which imposes only moderate burdens could well fail the [Supreme Court's] balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational.").

22

## C.   Subsection 6 Violates Plaintiffs' Equal Protection Rights

Subsection 6 also violates Plaintiffs' rights under the Equal Protection Clause. *See Bullock* v. *Carter*, 405 U.S. 134, 141 (1972) (in regulating elections, states' "power must be exercised in a manner consistent with the Equal Protection Clause"). Even when state regulation does not differentiate voters based on suspect categories, it will not withstand Equal Protection scrutiny if it unreasonably disenfranchises a segment of the electorate without sufficient justification, since "[s]tates may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." *Carrington* v. *Rash*, 380 U.S. 89, 96 (1965); *see also O'Brien* v. *Skinner*, 414 U.S. 524, 530-31 (1974) (holding that "wholly arbitrary" statutes allowing detainees held outside home counties to vote while disenfranchising detainees held within home counties "deny appellants the equal protection of the laws guaranteed by the Fourteenth Amendment").

Subsection 6 arbitrarily and unreasonably causes different classes of similarly situated, eligible voters to be disparately treated. Those with numbers that have been verified are permitted to vote, as are those with no number on the form at all, but those with numbers that have not been verified are disenfranchised — even if all present the same evidence of eligibility. And similarly situated voters have markedly different chances of being able to successfully register based on the arbitrary distinction of their residence in different counties, or their submission of a driver's license number versus Social Security digits. As noted above, no legitimate State interest justifies this disparate treatment. Florida's disparate treatment of otherwise similar voters is not "consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush* v. *Gore*, 531 U.S. 98, 105 (2000). Accordingly, Plaintiffs have shown

23

a strong likelihood of success on their constitutional claims.

## III. Plaintiffs Meet the Other Requirements for a Preliminary Injunction

### A. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

The matching process in place in Florida will fail; in similar circumstances, it fails as often as 20-30% of the time. It will be impossible to correct many of these "failed" matches in a timely fashion. Because Subsection 6 makes the matching or verification of an administrative number a precondition to registration, if the Secretary enforces this law during the 2008 election cycle, thousands of eligible Florida residents who attempt to register and vote — including Plaintiffs' members — will be prevented from or overly burdened by doing so, even when they have submitted timely, accurate and complete voter registration forms. The violation of a citizen's right to vote is the quintessential injury justifying an injunction. *See, e.g., Touchston* v. *McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) ("[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made").

Plaintiffs will also suffer irreparable injury distinct from the demonstrated injuries to their members if this Court does not grant injunctive relief. With each eligible voter denied access to the polls, Subsection 6 will frustrate registration and mobilization efforts critical to Plaintiffs' organizational missions. The mobilization opportunities lost during the 2008 presidential election cycle cannot otherwise be remedied.

### B. The Balance of Hardships Clearly Falls in Plaintiffs' Favor

Plaintiffs seek to prevent a violation of the same federal law (HAVA) that the State purports to be implementing. The parties' interests are therefore aligned. Plaintiffs acknowledge that the Secretary, and all Florida citizens, have a vested interest in a fair,

24

orderly, and legitimate election. By enjoining the Secretary from enforcing Subsection 6, this interest is not jeopardized. Plaintiffs seek only to ensure that eligible applicants are duly registered to vote — as they were before Subsection 6 — even when the number on their forms cannot be matched or verified.

Equitable relief will not impose a substantial cost on the State — and there is still enough time to implement an injunction ensuring that voters' rights are preserved in the 2008 elections. To the extent there may be minimal cost to the State to proceed absent Subsection 6, that cost is far outweighed by the profound and irremediable hardship that the lack of an injunction will work on the eligible citizens of Florida.

## C. The Public Interest Mandates a Grant of Injunctive Relief

The public interest weighs strongly in favor of letting every eligible resident of Florida register and cast a vote. *See Charles H. Wesley Educ. Fdn., Inc.* v. *Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). As the elections approach, and more and more registration applications pour in, it is essential to the public interest, and their trust in the integrity of the elections, that the requested injunction be granted and that the Secretary be restrained from processing those applications in a way that illegally and unnecessarily disenfranchises Florida residents.

Finally, because the Secretary will not suffer material monetary loss due to the entry of preliminary injunctive relief, a bond is not required under Fed. R. Civ. P. 65(c).

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court enter an order enjoining the Secretary from enforcing Subsection 6 before the commencement of the 2008 election cycle.

25

Dated: September 17, 2007.

**GREENBERG TRAURIG, P.A.**

GLENN T. BURHANS, JR.
FLA. BAR NO. 605867
101 EAST COLLEGE AVENUE
TALLAHASSEE, FLORIDA 32301
TEL. (850) 222-6891
FAX (850) 681-0207

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
ROBERT A. ATKINS*
D. MARK CAVE*
J. ADAM SKAGGS*
1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TEL. (212) 373-3000
FAX (212) 492-0289

**BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW**
JUSTIN LEVITT*
MYRNA PÉREZ*
WENDY R. WEISER*
161 AVENUE OF THE AMERICAS, 12TH FLOOR
NEW YORK, NEW YORK 10013
TEL. (212) 998-6730
FAX (212) 995-4550

**ADVANCEMENT PROJECT**
ELIZABETH S. WESTFALL*
JENNIFER MARANZANO*
1730 M. STREET, NW, SUITE 910
WASHINGTON, DC 20036
TEL. (202) 728-9557
FAX (202) 728-9558

26

**PROJECT VOTE**
BRIAN W. MELLOR*
196 ADAMS STREET
DORCHESTER, MA 02122
TEL. (617) 282-3666
FAX (617) 436-4878

*Counsel for Plaintiffs*

\* *Pro Hac Vice* application to be filed

## CERTIFICATE OF SERVICE

Undersigned counsel herby certifies that a copy of the foregoing *Memorandum of*

*Law in Support of Motion for Preliminary Injunction* was served via HAND DELIVERY

this day, September 17, 2007, upon the following:

Kurt Browning, Defendant
Secretary of State
Florida Department of State
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399-0250

GREENBERG TRAURIG, P.A.

GLENN T. BURHANS, JR.
FLA. BAR NO. 605867
101 EAST COLLEGE AVENUE
TALLAHASSEE, FLORIDA 32301
Tel. (850) 222-6891
Fax (850) 681-0207

27

## APPENDIX

### Common Errors and Inconsistencies Affecting the "Match" Process
(Source: Declaration of Andrew Borthwick, ¶¶ 22-36)

#### Data Entry Errors:

- omitting characters (*e.g.*, "JOHN" becomes "JON");

- adding characters (*e.g.*, "OWEN" becomes "OWENS");

- transposing characters (*e.g.*, "THOMAS" becomes "TOHMAS," "SIERRA" becomes "SEIRRA);

- misspellings (*e.g.*, "GRAHAM" becomes "GRAMM," "LOPEZ" becomes "LOPES," "CARRERO" becomes "CARRERA," "DOMÍNGUEZ" becomes DOMÍNQUEZ);

- striking an adjacent key (*e.g.*, "SMITH" becomes "SMOTH");

- substituting characters (*e.g.*, "THOMAS" becomes "TH0MAS" or "THIMAS," "REID" becomes "REED," driver's license number "PØ14-233-80-034-1" becomes "PO14-233-80-034-1");

#### Improper Use of Fields:

- omitting fields (*e.g.*, "MARIE-MAUDE" becomes "MARIE," "JAMES THOMAS" becomes "THOMAS");

- adding fields (*e.g.*, "JAMES THOMAS" becomes "JAMES J THOMAS" or "MR JAMES THOMAS" or "CAPT JAMES THOMAS");

- transposing fields (*e.g.*, "JAMES THOMAS" becomes "THOMAS JAMES," "BAO" "LU" becomes "LU" "BAO");

- substituting fields (*e.g.*, "JIMMY THOMAS" becomes "JAMES THOMAS");

- improperly separating fields – *e.g.*, a hyphenated last name is separated into a middle name and last name ("JAMES" "THOMAS-SMITH" becomes "JAMES" "THOMAS" "SMITH," "ILEANA" "ROS-LEHTINEN" becomes "ILEANA" "ROS" "LEHTINEN," "JEAN-CLAUDE" becomes "JEAN" "CLAUDE");

- improperly combining fields, such as the middle (or maiden) and last names (*e.g.*, "MARY" "ANN" "THOMAS" becomes "MARY ANN" "THOMAS," "GEORGE" "HERBERT" "WALKER" "BUSH" becomes "GEORGE" "HERBERT WALKER" "BUSH," DEBBIE" "WASSERMAN" "SCHULTZ" becomes "DEBBIE" "WASSERMAN-SCHULTZ").

**Natural Data Inconsistencies:**

- one record contains a nickname and the other contains the full given name (*e.g.*, "SAM" and "SAMUEL," "LIZ" and "ELIZABETH," or "MANNY" and "MANUEL" would not match);

- one record contains one spelling of a transliterated foreign name or name using a diacritical mark, the other record contains an alternative spelling, and the matching algorithm does not recognize equivalences (*e.g.*, "MUHAMMAD" and "MOHAMMED," or "WANG" and "HWANG" and "WONG," or "JÜRGEN" and "JUERGEN" or "JURGEN," or "GONZALEZ" and "GONZALES," or "DE LA CRUZ" and "DELACRUZ" would not match);

- one record contains punctuation within a name and the other record omits the punctuation (*e.g.*, "O'BRIEN" and O BRIEN" would not match);

- one record recognizes characters with diacritical marks, the other record does not, and the matching algorithm does not recognize equivalences (*e.g.*, "RODRÍGUEZ" and "RODRIGUEZ" would not match);

- one record contains a woman's maiden name or her husband's name and the other contains her own married name (*e.g.*, "MRS. REBECCA JONES" and "MRS. REBECCA SMITH," or "MRS. JOHN SMITH" and "MRS. MARY SMITH" would not match);

- one record contains a woman's maiden name as a compound last name and the other contains her maiden name as a middle name (*e.g.,* "HILLARY" "RODHAM CLINTON" and "HILLARY" "RODHAM" "CLINTON" would not match);

- one record contains a citizen's first initial and middle name and the other contains her first name and middle initial (*e.g.*, "F. SCOTT FITZGERALD" and "FRANCIS S. FITZGERALD" would not match);

- one record contains an original given name and the other contains an "Americanized" given name which the applicant also considers to be official (*e.g.,* "GRACE KIM" and "HYUN KIM" would not match);

- one record contains an individual's name before a religious conversion and the other contains her name after such a conversion (*e.g.*, "MUHAMMAD ALI" and "CASSIUS CLAY" would not match); and

- one record contains a name appropriate at one period in life and the other contains a name appropriate in a different period (*e.g.*, in Burmese, "MAUNG TIN" (for younger men) and "U TIN" (for married men) would not match).

*TAL 451432952v1 9/17/2007*

2