**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA STATE CONFERENCE
OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF
COLORED PEOPLE (NAACP),
as an organization and representative
of its members; et al.;

                      Plaintiffs,

v.                                      CASE NO. 4:07CV-402-SPM/WCS

KURT S. BROWNING, in his official
capacity as Secretary of State
for the State of Florida,

                      Defendant.

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

       This cause is before the Court on Plaintiffs' Motion for Preliminary

Injunction (Doc. 4) and Renewed Motion for Preliminary Injunction (Doc. 132).

For the reasons set forth below, Plaintiffs' request for a preliminary injunction

will be denied.

### I. INTRODUCTION

       Under Florida law, voter registration applicants who have a Florida

driver's license, a Florida identification card, or a Social Security number must

place their driver's license number, identification card number, or, if they have

neither, the last four digits of their Social Security number on their voter

registration applications. See § 97.053(5)(a)5., Fla. Stat. (2007); cf. 42 U.S.C.

§ 15483(a)(5)(A)(i). Election officials then attempt to verify the authenticity of

the number provided by the applicant through computerized, and, if necessary,

individual review of official state and federal databases.[1] See § 97.053(6), Fla.

Stat. (2007); cf. 42 U.S.C. § 15483(a)(5)(B).  Finally, Section 97.053(6), Florida

Statutes ("Subsection Six"), requires the applicants whose numbers could not

be verified to respond to a notice letter by showing their driver's license,

identification card, or Social Security card to election officials, either in person

or by providing a copy of the card by mail, facsimile, or e-mail. Cf. 42 U.S.C. §

15483(a)(5)(A)(iii).[2]  It is this last requirement—the requirement that unverified

---

[1] Prior to the June 5, 2008 amendment to the state statute, this verification process was done only by matching the numbers for the applicant's identification number that the applicant placed on the voter registration application to the same numbers in a corresponding database (the Florida Department of Highway Safety and Motor Vehicles or the Social Security Administration).  Now this process requires only the verification of one of these forms of identification, regardless of the type of identification number supplied on the registration application.

[2] Subsection Six arises indirectly from the efforts of Congress to enhance the efficiency and integrity of election administration.  Soon after the disputed 2000 election, Congress passed the Help America Vote Act of 2002 ("HAVA").  HAVA is the cornerstone of "a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient." Crawford v. Marion County Election Board, 553 U.S. ___, 128 S. Ct.  1610 (2008).  It requires, inter alia, that applicants who have a current and valid driver's license or Social Security card place their driver's license numbers or the last four digits of their Social Security numbers on their applications.  See 42 U.S.C.  § 15483(a)(5)(A)(i).  HAVA then directs each state to determine according to its own laws whether the information provided by the applicant "is sufficient to meet the [federal requirements." Id.  § 15483(a)(5)(A)(iii); Florida State Conference of the NAACP v. Browning, 522 F.3d 1153, 1156 (11th Cir. 2008).  Accordingly, the United States Supreme Court recently recognized Congress' efforts to modernize election processes and noted that, as part of this effort, HAVA "specifies either an 'applicant's driver's license number' or 'the last 4 digits of an applicant's social security number' as acceptable verifications." Crawford, 128 S. Ct.  at 1617.

applicants provide evidence of their numbers in order to complete their voter registrations—that Plaintiffs challenge in this action.

The Court examines the constitutionality of Subsection Six as amended by the Legislature at its most recent session.  Cf.  Tallahassee Memorial Regional Medical Center v. Bowen, 815 F.2d 1435, 1454 n.40 (11th Cir. 1987) ("A court ordinarily will apply the law in effect at the time it renders its decision.").  While Plaintiffs appear to concur in the propriety of this approach (Doc. 135 at 6 n.4), they note that the recent amendment has not yet received preclearance from the United States Department of Justice pursuant to Section 5 of the Voting Rights Act.  Only five of Florida's sixty-seven counties, however, are subject to Section 5 of the Voting Rights Act.  See 40 Fed.  Reg. 43746 (Sep. 23, 1975); 41 Fed. Reg.  34329 (Aug. 13, 1976).

Under the circumstances, it is not premature, as a legal matter, to consider the constitutionality of Subsection Six as recently amended.  Under Section 5, an amendment to a "prerequisite to voting, or standard, practice, or procedure with respect to voting" will be precleared if it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C.  § 1973c.  The parties mutually expect that the most recent amendments to Subsection Six will be precleared.

For the remainder of this Order, all references to Subsection Six will be to the statute as amended and signed into law on June 5, 2008.  This Court

does not make any determination about the constitutionality of the earlier version of Subsection Six.  The earlier Subsection Six had significant legal infirmaries and this Court does not foreclose the possibility that this older version may not have passed constitutional muster.  However, that version is not as issue here.  Additionally, the analysis of Subsection Six done prior to this current incarnation is not up for discussion.  The only version subject to analysis by this court is the amended version of Subsection Six, signed into law on June 5, 2008.

## II. PROCEDURAL BACKGROUND

The Florida State Conference of the NAACP, the Southwest Voter Registration Education Project, and the Haitian-American Grassroots Coalition filed this action against Florida Secretary of State Kurt S. Browning (the "Secretary") on September 17, 2007.  Plaintiffs' nine-count Complaint alleged that Subsection Six is preempted by various provisions of HAVA, the Voting Rights Act (the "VRA"), and the National Voter Registration Act of 1993 (the "NVRA"), and that Subsection Six violates the right to vote, equal protection,

and due process under the United States Constitution.[3]  (Doc. 12.) Plaintiffs

moved for a preliminary injunction (Doc. 4), and the Secretary filed a Motion to

Dismiss directed to each of the Complaint's nine counts (Doc. 23).

On December 11, 2007, this Court held a hearing on Plaintiffs' Motion

for Preliminary Injunction, and, on December 18, 2007, the Court granted

Plaintiffs' request.  (Doc. 105.)  The Court concluded that HAVA and the

materiality provision of the VRA preempt Subsection Six and accordingly

declined to reach Plaintiffs' constitutional claims.  (Id.) At the same time, the

Court granted the Secretary's Motion to Dismiss with respect to Plaintiffs'

claims that Subsection Six is inconsistent with the NVRA and Section 2 of the

VRA.

The Secretary appealed the entry of a preliminary injunction, and, on

_____

[3]  In Count I, Plaintiffs argued that Subsection Six is preempted by Section 303(b) of
HAVA (42 U.S.C.  § 15483(b)), which requires applicants who register by mail to present photo
identification when they first present themselves to vote.  (Doc. 12.) Count II alleged that
Subsection Six is preempted by Section 303(b)(2)(B) of HAVA (42 U.S.C.  § 15483(b)(2)(B)),
which permits applicants who do not satisfy the identification requirements of HAVA Section
303(b) to cast a provisional ballot.  Count III claimed that Subsection Six is preempted by
Section 303(a)(1) of HAVA (42 U.S.C.  § 15483(a)(1)), which requires each state to maintain a
computerized database of registered voters.  Count IV argued that Subsection Six is preempted
by the materiality provision of the VRA (42 U.S.C.  § 1971(a)(2)(B)), which prohibits states from
denying the right to vote on account of an immaterial error or omission on any record or paper.
Count V alleged that that Subsection Six is preempted by Section 2 of the VRA (42 U.S.C.  §
1973), which prohibits the use of election procedures that deny or abridge the right to vote on
account of race or color.  And, in Count VI, Plaintiffs contended that Subsection Six is
preempted by the NVRA (42 U.S.C.  § 1973gg-6), which requires states to ensure that
applicants who submit valid applications by a prescribed deadline prior to an election are
registered to vote at that election.  Counts VII and VIII, which allege that Subsection Six violates
the right to vote and equal protection, respectively, are the subject of this order.  Plaintiffs do not
pursue Count IX, which alleges a violation of due process, on the motions now before the Court.
(Doc. 132 at 2 n.2.)

April 3, 2008, the Eleventh Circuit Court of Appeals reversed.  <u>Florida State Conference of the NAACP v. Browning</u>, 522 F.3d 1153 (11th Cir. 2008).  The Court concluded that Plaintiffs failed to show a substantial likelihood of success on the merits of their claim that HAVA and the VRA preempt Subsection Six.  Like this Court, the Eleventh Circuit declined to address Plaintiffs' constitutional claims, <u>id.</u> at 1159 n.8, and Plaintiffs did not seek reconsideration or en banc review of the Eleventh Circuit's decision.

Unsuccessful with respect to their six statutory counts, Plaintiffs instead filed a Renewed Motion for Preliminary Injunction in this Court, asserting two of their three constitutional claims— specifically, the right to vote and equal protection.  (Doc. 132.)  On June 6, 2008, the Court held a hearing on Plaintiffs' Renewed Motion.

### III.  FINDINGS OF FACT

<u>**Voter Registration in Florida**</u>

1.  In Florida, voter registration applications are collected and processed through multiple channels.  (Docs.  85-5 ¶ 3; 85-6 ¶ 4.)

2.  The sixty-seven county Supervisors of Elections and the Bureau of Voter Registration Services ("BVRS") for the Florida Department of State, Division of Elections, employ data entry operators who enter information contained on voter registration applications into the Florida Voter Registration System ("FVRS")—the statewide, computerized database of registered voters.

(Doc. 85-5 ¶ 3.)

3.  Some applications received by the Supervisors or BVRS are delivered, in person or by mail, directly by applicants, while others are initially collected by third-parties, such as groups that conduct voter registration drives or voter registration agencies designated by state law pursuant to the mandate of the NVRA.  (Id.)

4.  In addition, Florida citizens may register to vote in connection with driver's license or identification card transactions at the offices of the Florida Department of Highway Safety and Motor Vehicles ("DHSMV").  (Doc. 85-6 ¶ 4.)  Voter registration at DHSMV offices takes place electronically.  DHSMV's computerized system inserts the applicant's correct driver's license or identification card number into the relevant field of the voter registration database, and, accordingly, that number is automatically verified.  (Id.)

5.  In the case of applications entered into FVRS by the Supervisors and BVRS, election officials attempt to enter data properly.  Data entry clerks are trained in the performance of their duties.  (Doc. 85-3 at 9:3-9, 36:9-16, 53:9-15, 64:22-65:1; Doc. 85-4 at 5:14-15, 17:25-18:7.)[4]  Proofreading data entries is commonplace among the Supervisors of Elections.  (Doc. 85-3 at 5:21-6:3, 12:24-13:9, 51:15-21, 66:5-15; Doc. 85-4 at 6:2-17, 15:25-16:20.)

6.  Data entry clerks electronically scan original applications and

_____

[4]  The page numbers used to designate deposition excerpts correspond to the page numbers assigned to the documents by the CM/ECF system.

associate the resulting image with the appropriate entry in the FVRS database, in an effort to ensure a permanently retrievable record of the application and enabling subsequent proofreading.  (Doc. 85-3 at 4:25-5:4, 34:7-21, 52:11-13, 63:3-12; Doc. 85-4 at 21:3-13.)

**Verification Under Subsection Six**

7.  Once the information from a voter registration application is entered by election officials into FVRS, it is transmitted to DHSMV for verification of the driver's license number, identification card number, or last four digits of the Social Security number provided by the applicant on the application.  (Doc. 85-5 ¶ 5; Doc. 139-2 ¶ 3.)

8.  Applications received in connection with driver's license or identification card transactions at DHSMV offices are not separately transmitted to DHSMV for verification because, by virtue of their origin, they already contain the applicant's correct, verified identifying number.  (Doc. 85-5 ¶ 4; Doc. 85-6 ¶¶ 4-6; Doc. 139-2 ¶ 3.)

9.  When registration data is transmitted to DHSMV for verification, DHSMV performs computerized searches of its database, and, if necessary, of the database maintained by the federal Social Security Administration.  (Doc. 85-5 ¶ 4; Doc. 85-6 ¶¶ 6-7; Doc. 139 ¶ 3.) Based on the results of DHSMV's database searches, records are classified as matched, possibly matched, or unmatched.  (Doc. 85-5 ¶ 6; Doc. 85-6 ¶ 7; Doc. 139 ¶ 4.)

10.   Under new procedures that were signed into law on June 5, 2008, all records classified as possibly matched or unmatched are routed to BVRS for individual review by BVRS staff.  (Doc. 139-2 ¶ 8.)  Previous to this amendment, records classified as possible matches—about half of all records that were not positively matched—were routed to BVRS for individual review, while records classified as unmatched were returned directly to the Supervisors for local action.  (Id.  ¶¶ 8-9.)

11.   Individual review by BVRS staff of all records for which DHSMV did not find a positive match has been instituted for the purpose of providing a uniform level of review for all records and as an effort to try to ensure that a greater percentage of such records are resolved without any need for further action on the part of the Supervisors or applicants.  (Id.  ¶ 8.) The change enhances BVRS's ability to resolve applications unmatched by DHSMV. (Id.  ¶ 9.)

12.   Records classified as possibly matched or unmatched are transmitted electronically to BVRS for individual investigation.  (Doc. 85-6 ¶ 7.) These records are then investigated by BVRS staff.  (Doc. 85-4 at 40.) As a matter of routine, about twelve staff members daily review and attempt to resolve records transmitted to BVRS the previous evening.  (Doc. 85-4 at 42:19-43:10.)

13.   During individual review of records transmitted by DHSMV, BVRS

staff members have access to DHSMV's database, known as the Driver and

Vehicle Information Database ("DAVID").  (Doc. 85-5 ¶ 8.)  BVRS personnel

are instructed to make every possible attempt—using DAVID and other

resources—to resolve a record that was possibly matched or unmatched.  (Id.

¶ 9.)  Accordingly, the BVRS Procedures Manual directs staff to search the

DAVID system by the number provided by the applicant and according to the

applicant's name and possible variants of the applicant's name.  (Doc. 85-4 at

48.)

14.  In reviewing the registration records, BVRS staff have access to a

scanned image of the original application, as submitted by the voter registrant.

(Doc. 85-5 ¶ 11; Doc. 139-2 ¶¶ 5-7.)  The Division of Elections (the "Division")

now requires the Supervisors to provide the scanned image for BVRS review

in every instance requiring individual review.  (Doc. 139-2 ¶ 7.)  This amends

the prior practice, under which, in some instances, Supervisors either did not

provide images or did not provide them timely.  (Doc. 85-5 ¶ 8; Doc. 139-2 ¶¶

5, 7.)

15.  Specifically, the Division instructed the Supervisors to comply with

protocols established by the Florida State Association of Supervisors of

Elections requiring application images to be uploaded to FVRS within three

days of the application's input.  (Doc. 139-2 ¶ 7.)  The Division generates

reports to identify records for which no images are available and prompts the

Supervisors to provide the needed images.  (Id.; Doc. 139-3 at 2.) In addition,

the Division has modified its computer systems to provide these records to

BVRS as images become available.  (Doc. 139-2 ¶ 7.)

16.  If BVRS is able to verify a record returned to it by DHSMV, the

applicant to whom the record relates becomes an active voter.  (Doc. 85-5 ¶

6.) The appropriate Supervisor is notified electronically through FVRS to

process a voter information card.  (Id.)  If BVRS is unable to verify a record

returned to it by DHSMV, the record is sent to the appropriate Supervisor for

further action.  (Id.)  The reason that the record is unverified may be because

there was a typographical error in the data entry, or because the applicant

made a mistake when filling out the voter registration application.

17.  For the information of the Supervisors, BVRS enters individualized

comments into a comment field associated with each record it investigates and

returns.  (Id.  ¶ 9.)  In addition, BVRS maintains an e-mail account to assist

Supervisors with any questions, including questions about specific applicants.

(Doc. 41:1-24.) A BVRS staff member reviews inquiries from the Supervisors

and either provides answers or, if unable to do so, forwards the inquiry to the

proper person.  (Id.)  BVRS also provides assistance to staff members by

telephone.  (Doc. 85-4 at 32:17-20.)  The goal of BVRS is for the entire

verification process, from the time the information on the application is entered

into FVRS by data entry clerks until the time a notice of unmatched

applications is returned to the Supervisors, to take between twenty-four to forty-eight hours.  (Doc. 85-3 at 10:14-11:4, 40:22-41:3; 42:14-43:4; 67:25-68:5; Doc. 85-4 at 7:11-13; 14:3-7; 26:25-27:7.)  However, on some occasions, it has taken up to 13 days from the date that the application is submitted to the date that the application is verified.  (Doc. 147-7)

18.  On a daily basis, within about forty-eight hours after the initial data entry into FVRS, the Supervisors receive an electronic notification of the applications that could not be verified by DHSMV or BVRS. (Doc. 85-3 at 12:2-23, 61:24-62:3.)  The Supervisors mail notice letters to applicants whose applications could not be resolved and, to the extent possible, attempt to reach the applicants by phone.  (Doc. 85-3 at 14:25- 15:11; 169:13-25; Doc. 85-4 at 10:12-21, 22:5-12, 30:18-31.)

19.  The Division has prepared and plans to distribute a form notice letter for use by the Supervisors in contacting unverified applicants.  (Doc. 139-2 ¶ 11.)   The notice letter will specifically state that: (i) the Division has attempted to verify the number provided on the application; (ii) the Division was unable to verify the number; (iii) to validate the application, the applicant must provide a copy of his or her Florida driver's license, Florida identification card, or Social Security card to the Supervisor by mail, facsimile, or e-mail, or produce such documentation in person; (iv) if the applicant does not do so before the election, he or she may not vote a regular ballot, but may vote a

provisional ballot; and (v) for the provisional ballot to count, the applicant must provide a copy of his or her Florida driver's license, Florida identification card, or Social Security card to the Supervisor by mail, facsimile, or e-mail, or produce such documentation in person no later than 5 p.m. on the second day after the election.  (Id.  ¶ 12; Doc. 139-3 at 10.)

20.  The notice will also include the local Supervisor's contact information, including telephone and facsimile numbers and street and e-mail addresses, and it will invite the applicant to contact the Supervisor's office with any questions.  (Doc. 139-2 ¶ 12; Doc. 139-3 at 10.)  The Supervisors' staff also researches unverified records individually, including additional proofreading, in an attempt to resolve the issue and complete the applicant's registration without any action by the applicant.  (Doc. 85-3 at 38:14-39:5, 40:10-21; Doc. 85-4 at 85:23-86:7, 86:22-87:5, 29:13-21.)

21.  Applicants whose numbers could not be verified are not required to travel to the Supervisors' offices to validate their numbers.  Rather, the Supervisors will accept evidence of an applicant's identifying number in any visible form, however conveyed—whether by personal delivery, mail, facsimile, or e-mail transmission.  (Doc. 85-3 at 7:19- 8:4, 27:18-28:20, 29:20-22, 30:20-23; 44:23-45:13; Doc. 85-4 at 35:14-36:4.)  The only limitation is that the Supervisors must be able to "see" the evidence, and, accordingly, it cannot be provided by telephone.  (Doc. 85-3 at 25:21-26:1; Doc. 85-4 at 28:15-29:1.)

**Data Illustrating the Operation of Subsection Six**

22.  Between January 1, 2006, and September 30, 2007, official data show that state and local election officials received voter registration applications from 1,529,465 unique applicants.  (Doc. 85-4 at 61.)  Of the 1,529,465 applications received during this period, 36,122 applications were classified as unmatched by DHSMV and, under procedures no longer in place, were returned to the Supervisors for local action.  (Doc. 85-5 ¶ 7.) As of June 5, 2008, each of these records would be routed by DHSMV to BVRS for individual review before any that remain unverified are returned to the Supervisors.  (Doc. 139-2 ¶¶ 8-9.)

23.  Of the 1,529,465 applications received during this period, an additional 36,802 applications were classified as possibly matched and were transmitted to BVRS 13 for further review and investigation.  (Doc. 85-5 ¶ 7.) Of these, BVRS resolved 30,985 applications—about 84 percent of the applications it received.  The remainder (with some exceptions for applications that were discovered to be updates rather than new applications) were returned to the Supervisors for local action.  (Id.)

24.  Thus, a total of 41,189 applications (36,122 without BVRS review and 5,067 after BVRS review) were returned to the Supervisors.  (Id.) These applications belonged to 31,506 unique applicants, who comprised 2.06 percent of the total number of unique applicants during the relevant period.

(Doc. 85-4 at 61.) Accordingly, about 98 percent of all new applicants cleared the verification process without any further action requested of the applicant.

25.  Plaintiffs' suggestion that the number of applications received during the relevant period was 1,088,964 rather than 1,529,465 is not supported by the record.  (Doc. 135 at 5 n.2.)  Affidavit evidence shows that FVRS itself reflects 1,529,465 applications.  Plaintiffs' contrary reliance on an unsworn report appearing on the Internet is not persuasive.  The number of new registrants (as opposed to applicants)—or any other number gleaned from the Division's website—is not the appropriate denominator.  Even if this Court were to credit Plaintiffs' proposed denominator, the proportion of applicants required to establish their numbers would not materially change.  It would be only 2.89 percent (31,506 of 1,088,964).

26.  Between January 1, 2006, and September 30, 2007, 1,446 voter registration applications indicated that the applicant did not possess a driver's license, identification card, or Social Security card.  (Doc. 85-5 ¶ 5.) This represents less than one tenth of one percent of all applications received during that period.  As discussed above, these data in part reflect procedures that have since been amended and improved.  The individual review of records classified as unmatched and the uniform availability of scanned images will enhance BVRS's capacity to resolve unverified applications and will greatly reduce the proportion of applicants required to validate their

numbers, even from their current, minimal levels.

27.  There is no evidence in the record that applicants who are required to validate their numbers cannot comply with the law.  There is no evidence that any applicant is without access to some form of transportation to the local Supervisor's office or is unable to make a copy of a card and send the copy to the Supervisor.  Indeed, there is no evidence in the record that making a trip to the Supervisor's office or providing a copy of a card—for example, by sending a copy by mail—presents an extraordinary burden to any applicant.

28.  There is also no evidence, whatever disparities in resources might exist from county to county, that applicants in any county have been deprived of the services that Florida law charges the Supervisors to perform.  There is no evidence of the resources respectively available to Florida's sixty-seven Supervisors or, consequently, any disparities among those resources.

## IV. ANALYSIS AND CONCLUSIONS OF LAW

Plaintiffs contend that Subsection Six, on its face, violates the right to vote and equal protection and is therefore facially invalid under the United States Constitution.  To determine the validity of these claims, the Court examines the applicable standard, the facial requirements of Subsection Six, and the applicable constitutional analysis.

**Preliminary Injunction Standard**

1.  The grant of a preliminary injunction is "the exception rather than the

rule." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1175 (11th Cir. 2000) (quoting <u>Texas v. Seatrain Int'l, S.A.</u>, 518 F.2d 175, 179 (5th Cir. 1975)).  A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." <u>Id.</u>  (quoting <u>McDonald's Corp.  v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998)) (internal marks omitted).

2.  A District Court may grant a preliminary injunction only if the moving party establishes that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." <u>Id.</u>  "The first of the four prerequisites to temporary injunctive relief is generally the most important." <u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1223, 1232 (11th Cir. 2005).

3.  "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." <u>United States v. Frandsen</u>, 212 F.3d 1231, 1235 (11th Cir. 2000).  Thus, on a facial challenge, "the plaintiff bears the burden of proving that the law could never be applied in a constitutional manner." <u>DA Mortgage, Inc.  v. City of Miami Beach</u>, 486 F.3d 1254, 1262 (11th Cir. 2007).

**Subsection Six**

4.   The Florida Legislature adopted Subsection Six at its 2005 regular session, and it took effect on January 1, 2006.  See Ch.  2005-278, §§ 6, 56, Laws of Fla.  19  Since its initial adoption, Subsection Six has been amended twice.  See Ch.  2007-30, § 13, Laws of Fla.; Ch.  2008-95, § 3, Laws of Fla. The amendments adopted by the Legislature at its 2008 regular session became law on June 5, 2008, immediately upon receiving the Governor's signature.  Ch.  2008-95, § 3, Laws of Fla.

5.   Subsection Six provides in relevant part that, if:

> the driver's license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant cannot be verified, the applicant shall be notified that the number cannot be verified and that the applicant must provide evidence to the supervisor sufficient to verify the authenticity of the applicant's driver's license number, Florida identification card number, or last four digits of the social security number.

§ 97.053(6), Fla.  Stat.  (2007).  If the applicant "provides the necessary evidence," the Supervisor must "place the applicant's name on the registration rolls as an active voter."

6.   Subsection Six permits applicants who submit their applications in advance of the book-closing deadline to provide the necessary evidence after registration books close—and for two days after an election—and to cast a valid ballot at that election.  In general, the "registration books must be closed on the 29th day before each election and must remain closed until after that

election." § 97.055(1), Fla.  Stat.  (2007); <u>Diaz v. Cobb</u>, 541 F.  Supp.  2d 1319, 2008 WL 793584 (S.D.  Fla.  2008).  Nevertheless, under Subsection Six, if the applicant provides the necessary evidence by election day, the applicant is registered and may cast a regular ballot.  If not, the applicant may cast a provisional ballot, which will be counted "if the applicant presents evidence to the supervisor of elections sufficient to verify the authenticity of the applicant's driver's license number, Florida identification card number, or last four digits of the social security number no later than 5 p.m. of the second day following the election."

7.  As discussed above, an applicant can satisfy this requirement by showing local election officials a driver's license, identification card, or Social Security card, or by sending election officials a copy of the card.  The copy may be provided by any means, including mail, facsimile, or e-mail transmission.  The notice letter developed by the Secretary clearly sets forth the steps an applicant must take to become registered.

8.  The amendment to Subsection Six at the Legislature's most recent session made a significant change that facilitates voter registration.  The amended Subsection Six permits all applicants whose numbers could not be verified by DHSMV or BVRS to provide evidence of their number and become registered.  The bill passed by a vote of 113-0 in the House and 36-2 in the Senate.

9.  Prior to this amendment, Subsection Six allowed an applicant to "verify the authenticity of the number provided on the application." If the applicant's actual number did not match the number "provided on the application," a new application was required.  And if the new application followed book closing, the applicant was ineligible to vote in that election.  <u>See</u> § 97.055(1), Fla.  Stat.  (2007).

10.  The amendment, by contrast, permits an applicant to "verify the authenticity of the applicant's driver's license number, Florida identification card number, or last four digits of the social security number." Ch.  2008-95, § 3, Laws of Fla.  The ability to establish one's actual number is no longer limited to applicants whose numbers were correct as written on the application.  All unverified applicants, even after book-closing, can now present their cards—or send in a copy—and vote.  Likewise, any applicant who does not validate his or her number before the election and thus casts a provisional ballot may, within two days after the election, provide such evidence (in person or otherwise), and the ballot will count, whether or not the number on the original form was correct.[5]  <u>See</u> <u>id.</u>

11.  Applicants who do not possess a driver's license, identification card,

---

[5]  A substantial part of Plaintiffs' argument prior to the statutory amendment was directed to the fact that, under the prior version of the law, applicants were required to validate the number on their forms—not establish their actual number.  The amendment obviates this complaint and, together with the recent process amendments, decreases the probative value of the evidentiary record before the Court, since it was compiled exclusively under the markedly different, pre-amendment regime.

or Social Security card are not required to obtain one in order to register to vote.  Rather, the applicant must "affirm this fact in the manner prescribed in the uniform statewide voter registration application." § 97.053(5)(a)5., Fla. Stat. (2007).

**The Constitutional Right to Vote**

12.  "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . ." Burdick v. Takushi, 504 U.S. 428, 434 (1992).  "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974).

13.  The Constitution itself recognizes this interest, expressly authorizing states to regulate the "times, places and manner of holding elections." See Art. I, § 4, U.S. Const.  The Supreme Court long ago explained that:

> [T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

Smiley v. Holm, 285 U.S. 355, 366 (1932).

14.  "To achieve these objectives, States have enacted comprehensive

and sometimes complex election codes." <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 789 (1983).  Predictably, "[e]lection laws will invariably impose some burden upon individual voters." <u>Burdick</u>, 504 U.S. at 434.  Each provision, "whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote." <u>Anderson</u>, 460 U.S. at 788.

15.  In particular, "States . . .  have considerable leeway to protect the integrity and reliability of . . .  election processes generally." <u>Buckley v. American Constitutional Law</u>, 525 U.S. 182, 191 (1999).  "A strict standard would be especially inappropriate in a case . . .  in which the right to vote is on both sides of the ledger." <u>Crawford v. Marion County Election Bd.</u>, 472 F.3d 949, 951 (7th Cir. 2007), aff'd, 128 S. Ct.  1610 (2008).  This occurs when the challenged law seeks to protect legitimate votes against dilution or invalidation by fraudulent ones.  <u>See</u> <u>Purcell v. Gonzalez</u>, 127 S. Ct. 5, 7 (2006) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote as effectively as by wholly prohibiting the free exercise of the franchise.") (quoting <u>Reynolds v. Sims</u>, 377 U.S. 533, 555 (1964)).

16.  "[T]o subject every voting regulation to strict scrutiny . . .  would tie the hands of States seeking to assure that elections are operated equitably and efficiently." <u>Burdick</u>, 504 U.S. at 434.  Laws imposing "severe" burdens

must be "narrowly drawn" to advance compelling state interests.  Id.  "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions .  .  .  , the State's important regulatory interests are generally sufficient to justify the restrictions." Id.  (marks omitted).

17.  A series of recent decisions illustrates the application of this standard and upholds election regulations that serve similar interests and impose similar or greater burdens than the amended version of Subsection Six.[6]  In Gonzalez v. Arizona, 485 F.3d 1041 (9th Cir. 2007), the Court affirmed the denial of a preliminary injunction prohibiting the enforcement of a state law requiring all voter registration applicants to submit a verifiable driver's license number or documentary evidence of citizenship together with their applications.  Id.  at 1047.  Plaintiffs complained that such evidence might be difficult or impossible to obtain, id. at 1050, and noted that voter registration had declined since the law took effect, id. at 1048.  The Court upheld the requirement as not severe because a "vast majority of Arizona citizens in all likelihood already possess at least one of the documents sufficient for

---

[6]  See, e.g., Crawford v. Marion County Election Board, 472 F.3d 909 (7th Cir. 2007), aff'd, 128 S. Ct.  1610 (2008) (photo identification law); Common Cause/Georgia v. Billups, 504 F.  Supp.  2d 1333 (N.D.  Ga.  2007) (same); Indiana Democratic Party v. Rokita, 458 F.  Supp. 2d 775 (S.D.  Ind.  2006) (same).  This year, in Diaz v. Cobb, 541 F.  Supp.  2d 1319, 2008 WL 793584 (S.D.  Fla.  2008), the Court concluded that the Constitution does not require Florida to permit applicants who submit incomplete applications before book-closing to complete them after the deadline and vote in the ensuing election.  It did so despite stipulated evidence that more than 11,000 applicants submitted incomplete applications in the four weeks prior to the 2006 general election book-closing and that many would be unable to correct in time to cast valid ballots.

registration." Id. at 1050.

18.  Still more recently, in Crawford v. Marion County Election Board, 553 U.S. ___, 128 S. Ct.  1610 (2008), the Supreme Court upheld the constitutionality of an Indiana law that required all in-person voters to present government-issued photo identification.  Under this law, a voter who failed to present the necessary identification could cast a provisional ballot that would be counted only if the voter brought such identification to the county clerk's office after the election.  Id.  at 1613-14.

19.  The Court found that the challenged law promoted three valid interests:

*Election Modernization*.  The state had "a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient." Id. at 1617.  Both the NVRA and HAVA contained provisions "consistent with a State's choice to use government-issued photo identification as a relevant source of information concerning a citizen's eligibility to vote." Id. at 1617-18.  These provisions indicated that "Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology." Id.  at 1618.

*Voter Fraud*.  While the law addressed in-person voter fraud, there was "no evidence of any such fraud actually occurring in Indiana." Id.  at 1619.  The

lead opinion, however, noted that (i) throughout history, there were "flagrant examples of such fraud in other parts of the country"; (ii) "occasional examples" had "surfaced in recent years" in other states; and (iii) Indiana had experienced absentee-ballot fraud in a recent mayoral election.  Id.  This was sufficient: "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.  Moreover, the interest in orderly administration and accurate record-keeping provides a sufficient justification for carefully identifying all voters participating in the election process."  Id.

　　　　*Safeguarding Voter Confidence*.  The law served the state's "interest in protecting public confidence in the integrity and legitimacy of representative government."  Id.  at 1620 (marks omitted).  This interest has "independent significance, because it encourages citizen participation in the democratic process."  Id.  An "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."  Id. (quoting Report of the Commission on Federal Election Reform, App.  136-37 (Sep.  2005)) (hereinafter "Carter-Baker Commission").

　　　　20.  The lead opinion then weighed the burdens imposed by the photo identification law.  It dismissed, as constitutionally irrelevant, burdens arising from "life's vagaries."  Id.  at 1620.  Examples of "life's vagaries" consisted of the possibility that a voter "may lose his photo identification" or might not

"resemble the photo in the identification because he recently grew a beard"
had no constitutional significance.  Id.  The burdens deemed "relevant" were
"those imposed on persons who . . . do not possess a current photo
identification."  Id.  Nevertheless, the "inconvenience of making a trip to the
[Bureau of Motor Vehicles], gathering the required documents, and posing for
a photograph surely does not qualify as a substantial burden on the right to
vote, or even represent a significant increase over the usual burdens of
voting." Id.  at 1621.

        21.  The only burden that warranted discussion was that on voters "who
find it difficult . . . to assemble the . . . required documentation to obtain a
state-issued identification."[7] Id.  But this limited burden was "by no means
sufficient to establish" the facial invalidity of the challenged law.  Id.  "A facial
challenge must fail where the statute has a 'plainly legitimate sweep.'" Id.  at
1623 (quoting Wash. State Grange v. Wash. State Repub. Party, 552 U.S.
___, 128 S. Ct. 1184, 1190 (2008)).  Even "assuming an unjustified burden on
some voters," the "proper remedy" was not to rashly "invalidate the entire

_____

        [7]  The concurrence expressed a single disagreement with the lead opinion.  It argued
that the burdens imposed must be weighed "categorically" and not with an eye to "the peculiar
circumstances of individual voters," concluding that it "is for the state legislatures to weight the
costs and benefits of possible changes to their election codes, and their judgment must prevail
unless it imposes a severe and unjustified overall burden upon the right to vote." 128 S. Ct.  at
1625, 1626-27 (Scalia, J., concurring).  The concurrence found the burden imposed "minimal
and justified," reasoning that the "burden of acquiring, possessing, and showing a free photo
identification is simply not severe," and agreeing that it does not "even represent a significant
increase over the usual burdens of voting." Id.  at 1624, 1627.

statute" and thereby "frustrate[] the intent of the elected representatives of the people." Id. (quoting Ayotte v. Planned Parenthood, 546 U.S. 320, 329 (2006)).

22.   Like the law challenged in Crawford, Subsection Six is justified by the state's compelling interest in fair and honest elections.  See Purcell, 127 S. Ct. at 7 ("A state indisputably has a compelling interest in preserving the integrity of its election process.").  It enhances the accuracy of Florida's voter registration rolls and contributes to securing to lawful voters the exercise of the rights to which registration gives admittance.

23.   As this Court and the Eleventh Circuit have previously recognized, the verification of an applicant's number decreases the likelihood of improper registration entries.  Browning, 522 F.3d at 1174 (Subsection Six "tends to make it more likely that the applicant is not a qualified voter than if the numbers had matched."); (Doc. 105 at 5 (Subsection Six "does make it harder to defraud the system.")).  It consequently decreases the likelihood that individuals who are not eligible to register will improperly exercise the rights secured to lawful voters and dilute valid and legitimate votes.  (Doc. 105 at 21 ("Subsection Six serves to protect the integrity of the election process because there is a link between voter registration fraud and actual voter fraud.")).

24.  It is well established that, in the election context, there is no need for an "elaborate, empirical verification of the weightiness of the State's

asserted justifications." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997); accord Munro v. Socialist Workers Party, 479 U.S. 189, 195-96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . ."). Indeed, if there was ever any doubt about this position, Crawford extinguished it. See Crawford, 128 S. Ct. at 1619 (upholding a voter identification law despite the fact that the record contained "no evidence of any [in-person] fraud actually occurring in Indiana at any time in its history.").

25. In Crawford, the lead opinion cited historical examples of in-person vote fraud, occasional examples in recent times of in-person fraud in other parts of the country, and recent absentee-ballot fraud in Indiana itself. Id. By analogy, and as detailed above, there is no absence of evidence of voter registration fraud throughout the country, from California to Texas to Hawaii to Maryland to Florida. See Carter-Baker Commission Report, 46. The Secretary, moreover, has produced several examples of suspicious applications and multiple registrations that disprove Plaintiffs' uncorroborated assertion that voter registration fraud is mythical.

26. In addition, Florida, like Indiana, has a rich history of absentee-ballot fraud, including at least two elections in which courts invalidated every single absentee ballot because of widespread fraud. See In re The Matter of the Protest of Election Returns & Absentee Ballots in the

November 4, 1997 Election for the City of Miami, Fla., 707 So. 2d 1170 (Fla.

3d DCA 1998); Bolden v. Potter, 452 So. 2d 564 (Fla. 1984).  Florida has also

experienced fraud in connection with its constitutional amendment 29 initiative

petition process.  See Floridians Against Expanded Gambling v. Floridians for

a Level Playing Field, 945 So. 2d 553 (Fla. 1st DCA 2006).

27.  As in Crawford, examples of voter registration fraud throughout the

country, actual and potential voter registration fraud in Florida, and recent

perpetrations of vote fraud in different forms in this state are more than

sufficient to establish Florida's interest in measures that promote the integrity

of its elections.

28.  Related to the state's interest in the prevention of registration fraud

is its interest in orderly administration and accurate record-keeping.  This

interest "provides a sufficient justification for carefully identifying all voters

participating in the election process"—as the amended Subsection Six does.

Crawford, 128 S. Ct. at 1619; accord Hussey v. City of Portland, 64 F.3d 1260,

1265-66 (9th Cir. 1995) (laws "promot[ing] traditional goals" such as "accurate

and complete voter registration" are "subject only to limited scrutiny").

29.  Subsection Six, as amended, also furthers Florida's interest in

participating in a "nationwide effort to improve and modernize election

procedures." Crawford,   at 1617.  Crawford relied on HAVA and the NVRA to

show Congress' belief that the use of photo identification is a legitimate use of

"improved technology" relevant to the integrity of elections.  At the same time, the Court noted that HAVA "requires the States to verify voter information contained in a voter registration application and specifies either an 'applicant's driver's license number' or 'the last 4 digits of the applicant's social security number' as acceptable verifications." Id.  (quoting 42 U.S.C.  § 15483(a)(5)(a)(i)).  Thus, the verification of an applicant's identifying number is precisely the sort of improved election technology recommended by Congress and countenanced by the Supreme Court.

30.  Finally, it is clear that "public confidence in the integrity and legitimacy of representative government" promotes "citizen participation in the democratic process." Id.  at 1620.  This interest has "independent significance," id., and is nearly as weighty as the state's interest in the prevention of fraud, cf.  Buckley v. Valeo, 424 U.S. 1, 27 (1976) (concluding the "the appearance of corruption" in public office is of "almost equal concern" as corruption itself).

31.  By securing lawful votes from debasement by unlawful votes, Subsection Six enhances public confidence and encourages citizen participation.  In Purcell v. Gonzalez, 549 U.S. 1 (2006), the Court explained that:

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.  Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.  Voters who fear their legitimate

> votes will be outweighed by fraudulent ones will feel
> disenfranchised.

Accord Carter-Baker Commission Report, 18 ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or confirm the identity of voters.").  Subsection Six, as amended, provides these safeguards.

32.  While it promotes valid and important state interests, Subsection Six is no more burdensome—indeed, it is less so—than election regulations recently sustained by federal courts, including the Supreme Court in Crawford.  Subsection Six contains two separate requirements.  First, about one half of applicants—those that do not register at DHSMV—must write their number on their applications.  Plaintiffs do not contend that this initial burden is severe.  It is not severe.  Rather, they attack the second requirement: that a small percentage of applicants—those whose numbers could not initially be verified—show their driver's license, identification card, or Social Security card (or send a copy of the card) to election officials.

33.  To determine whether an election regulation imposes severe burdens, the Court must ascertain the magnitude and character of the challenged requirement.  The qualitative burden imposed by the amended version of Subsection Six pales in comparison with that imposed by election laws recently upheld by federal courts.  Unverified applicants are simply required to show a card they already possess, and they can do so either in

person or by sending a copy to local election officials, before or after an election.  Plaintiffs' assertion that an applicant whose number cannot initially be verified is "blocked" from the electoral process is inaccurate.

34.  Plaintiffs advance no evidence that applicants who are required to validate their numbers cannot comply with the law.  There is no evidence that any applicant is without access to some form of transportation to the local Supervisor's office.  There is no evidence that any applicant is unable to make a copy of a driver's license or Social Security card and send the copy to the Supervisor by mail, fax, or email.  Indeed, there is no evidence that these requirements present extraordinary burdens for any applicant.[8]

35.  Indeed, these burdens—to drive to an elections office or send a piece of mail—are not constitutionally cognizable impediments to the right to vote.  To drive to the Supervisor's office is no more onerous than to drive to a polling place on election day.  And to make a copy of a card which the applicant already possesses and send it to the Supervisor is no more onerous than to obtain, complete, and submit an application.

36.  Crawford confirms this conclusion.  Six Justices agreed that, for

---

[8]  The fact that some applicants have not validated their numbers and become registered does not prove that the burden imposed is severe.  Cf. Crawford v. Marion County Election Bd., 472 F.3d 949, 951 (7th Cir. 2007), aff'd, 128 S. Ct.  1610 (2008) ("[E]ven very slight costs in time or bother or out-of-pocket expense deter many people from voting, or at least from voting in elections they're not much interested in.  .  .  .  [A] few who have a photo ID but forget to bring it to the polling place will say what the hell and not vote, rather than go home and get the ID and return to the polling place.").

voters who lacked photo identification, the "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 128 S. Ct. at 1621; accord id. at 1627 (Scalia, J., concurring).  The requirement of a special trip with underlying documentation to obtain a government-issued identification card at a government office was "surely" not a substantial burden— much less a severe one.  Here, any inconvenience is even less. Unverified applicants are not required to appear in person at the Supervisor's office, but instead have the option to send a copy of their driver's license or Social Security card by mail, facsimile, or email.

37.  The only burden which in Crawford occasioned any hesitation—the burden on voters without identification who might be unable to "assemble the . . . required documentation to obtain a state-issued identification"—is not present here.[9]  Under Subsection Six as amended, no applicant is required to obtain an identification card he does not have.  Applicants who lack identification need only "affirm this fact" where prompted on the application in

---

[9]  Even this burden did not warrant facial invalidation of the challenged law, which had a "plainly legitimate sweep," and the concurrence dismissed its relevance altogether.  In Gonzalez, the Court affirmed the denial of a preliminary injunction despite the allegation that some applicants might be unable to secure the proof of citizenship required for voter registration.  By contrast to Crawford and Gonzalez, Subsection Six applies only to applicants who are already positioned to comply with its requirement.

order to be registered.  See § 97.053(5)(a)5.b., Fla.  Stat.  (2007).[10]

38.  The requirements of the amended Subsection Six are no different in degree or kind from those routinely required of voters.  The Constitution does not bar a state from guarding the integrity of its elections by asking a small percentage of applicants to make one trip to a local office or mail a copy of a card in the applicant's possession.  No federal court has espoused a position so restrictive and crippling to the orderly administration of elections.

39.  Moreover, even under the old version of Subsection Six, the vast majority of applicants were never asked to validate their numbers.  Between January 1, 2006, and September 30, 2007, Subsection Six required at most[11] 2.06 percent of new applicants (36,502 of 1,529,465) to validate their numbers.[12]  About 98 percent of applicants have nothing more to do under

———————————

[10]  Plaintiffs note that it might be feasible to permit applicants to identify themselves by a passport or military identification.  As the Court in Diaz recently explained, however, the Constitution does not require election regulations to permit everything that is "feasible" or "doable." Diaz, 2008 WL 793584, at *11.  The "question is not whether Plaintiffs' particular proposal is feasible, but whether an important regulatory interest supports the challenged law." Id. at *12.

[11]  An unknown number of even these applications were resolved without any need for action by the applicant.  Local election officials often research records returned to them and are able to resolve a number of these records themselves.

[12]  Even if, contrary to official data derived from FVRS, this Court were to credit the information assembled by Plaintiffs from the Internet, the proportion of applicants required to validate their numbers is at most 2.89 percent (36,502 of 1,088,964).

Subsection Six than provide their number with their applications.[13]

40.  Recent process amendments greatly reduce the scope of Subsection Six from its already narrow compass.  Earlier in its implementation, only about half of applicants for whom DHSMV could not locate a match were routed to BVRS for individual review.  As of June 1, 2008, all records—whether or not a potential match is found—will be routed to BVRS for review.  This new process should greatly reduce the number of unverified or "unmatched" registration applications.

41.  The Secretary has also directed the Supervisors to timely provide images of original application forms.  The computer system has been modified to provide regular reports to the Supervisors of tardy image submissions and to transmit records from DHSMV to BVRS as images become available.  This critical tool enables BVRS staff to correct data entry errors without any effort by the applicant.  Individual review of all unverified applications together with all application images will substantially decrease the proportion of new applicants that must take a further step to effect their registrations.

---

[13]  Plaintiffs would nearly double this number by ignoring all applications initially submitted to DHSMV, presumably because these applications are automatically accompanied with the applicant's correct driver's license number.  (Doc. 135 at 4 n.2.) In determining the extent to which a state law burdens the right to vote, it is wrong to disregard applicants whose right to vote was not burdened because their right to vote was not burdened.  Plaintiffs' creative math improperly converts laws of narrow application into laws of broad application.  In addition, applications submitted at DHSMV, like all other applications, must contain the applicant's correct number.  The fact that they do does not warrant their exclusion from the constitutional calculus.

42.  There is no record evidence of the operation of the law as amended by the Legislature at its 2008 regular session and as implemented by the Division according to its recent process amendments.  Plaintiffs essentially ask the Court to proceed on an undeveloped factual record and accept their predictions as a basis for the facial invalidation of an amended Subsection Six.  This the Court will not do.  Furthermore, to the extent that evidence relative to the former iteration of Subsection Six can inform the present inquiry, it does not, for reasons stated in this Order, clearly establish a substantial likelihood of success.

43.  Perhaps aware that sending a piece of mail or visiting a local office does not severely burden applicants, Plaintiffs attack the allegedly confusing notice letters sent by Supervisors to unverified applicants.  (Doc. 135 at 5.) This is not an appropriate basis for a facial challenge.  United States v. Salerno, 481 U.S. 739, 745 (1987) ("[T]he fact that a challenged law might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid under a facial challenge.").  Plaintiffs' request for a statewide injunction based on a sampling of the notice letters of a few of Florida's sixty-seven counties flies in the face of this established analysis.

44.  Even more conclusively, the Secretary has developed uniform guidelines prescribing the content of notices under Subsection Six.  These guidelines accurately inform applicants that the number provided could not be

verified and that the applicant must provide a driver's license, identification card, or Social Security card to the Supervisor, either in person or by mail, facsimile, or e-mail transmission.  They also inform applicants that, if these steps are not taken by election day, they may cast a provisional ballot which will be counted only if the evidence is provided by 5 p.m.  on the second day after the election.  The prescribed notice letters provide the Supervisors' addresses, telephone and facsimile numbers, and e-mail addresses, and invite applicants to call with questions.  They ensure that all applicants receive clear and full information.

45.  The fact that some applicants, in some counties, may not receive notice letters is an insufficient basis upon which to base a facial challenge.  All communications between the Supervisors and individual applicants regarding the disposition of voter registration applications—on whatever grounds—take place in precisely the same way.  42 U.S.C.  § 1973gg-6(a)(2) ("In the administration of voter registration for elections for Federal office, each state shall .  .  .  require the appropriate State election official to send notice to each applicant of the disposition of the application." ); § 97.073(1), Fla.  Stat. (2007) (requiring Supervisors to "notify each applicant of the disposition of the applicant's voter registration application").  All voter registration requirements, therefore, are equally subject to the vagaries of postal delivery.  Thus, if an applicant fails to sign an application, or if a data entry operator incorrectly enters the applicant's date of birth—for example, by entering "1998" rather

than "1989"—the Supervisors mail notices that might or might not reach the intended recipient.  There is no evidence that notice letters generated pursuant to Subsection Six are any less likely to arrive at their destinations than notice letters generated for any other purpose.  If the uncertainty of mail service can facially invalidate one voter registration requirement, it can do the same to all.  This is an untenable conclusion.

46.  Plaintiffs also suggest that unverified applicants who cast provisional ballots are not notified at the polling place of the steps necessary to complete their registrations and to render their ballots effective.  Under Subsection Six, however, each of these applicants must be sent a notice letter that informs them of the non-verification of the number provided.  The uniform letter developed by the Secretary not only specifies the steps the applicant must take, but also informs the applicant of the consequences of omitting those steps and the means of casting a valid provisional ballot.  For the same reason, Plaintiffs' argument that the language that accompanies a provisional ballot at the polls is misleading cannot stand.  Applicants who cast provisional ballots previously receive the notice letter that precisely and accurately explains the steps to be taken to ensure that the ballot will count.  Furthermore, the provisional ballot instructions are prescribed by Rule 1S-2.037(1)(c)2. of the Florida Administrative Code—a provision Plaintiffs have not challenged in this litigation.  Finally, the instruction—which indicates that the provisional voter "may provide written evidence supporting your

eligibility to vote to the Supervisor of Elections at (provide address of the Supervisor) by no later than 5:00 p.m. of the second day following the election"—is exact and accurate.

47.  Plaintiffs criticize the verification process by complaining of "typos, clerical mistakes, and data entry errors." (Doc. 135 at 1.) They assert that errors made by election officials in the attempt to match applicants' numbers create "damage" that cannot be repaired.  However, the verification process, as amended and signed into law on June 5, 2008, does not cause damage—it entirely exempts the vast majority of applicants from even the routine step of showing a card they already possess.  Thus, DHSMV or BVRS will relieve applicants of this burden.

48.  The proximate cause of non-verification is immaterial to the relevant constitutional test.  The burden is the same whether the applicant or an election official— or neither—erred.  The focus of the constitutional analysis is the burden itself—i.e., that non-verification requires a small percentage of applicants to take one routine step to effect their registrations—and the validity of the interests served by the challenged law.

49.  Human error in the registration process is inescapable and is not exclusive to Subsection Six.  A typo in an applicant's date of birth might result in the automatic denial of an application, but this does invalidate minimum age requirements.  An error in an applicant's address might frustrate his receipt of precinct information and hinder his ability to vote, but this does not

invalidate the entire registration regime.  The fact that human error might preclude verification and impose a constitutionally acceptable burden on a remarkably small fraction of applicants does not establish an infringement on the right to vote.

50.  Finally, Plaintiffs offer no evidence of the proportion of non-verifications attributable to applicants and the proportion attributable to lapses by election officials.  And the amended procedures by which BVRS staff will review all unverified applications individually, together with all corresponding application images, will greatly reduce any incidence of data entry error.

51.  Because the burden imposed by Subsection Six—the requirement that some applicants show a card they already have, in person or otherwise—is not severe, and because Subsection Six unquestionably promotes important regulatory interests, Plaintiffs have not established a substantial likelihood of success on their claim that the challenged law violates the constitutional right to vote.

**Equal Protection**

52.  "When analyzing whether a state election law violates the Equal Protection Clause of the Fourteenth Amendment, the Eleventh Circuit applies the same balancing test established in Burdick v. Takushi." Friedman v. Snipes, 345 F. Supp. 2d 1356, 1378-79 (S.D. Fla. 2004) (citing Fulani v. Krivanek, 973 F.2d 1539, 1543 (11th Cir. 1993)).  Thus, an election regulation

that does not impose severe burdens must be sustained if it is supported by "important regulatory interests." Burdick, 504 U.S. at 434.

53.  Plaintiffs first contend that Florida may not use the Social Security database because the verification rate may differ from that of the DHSMV database.  Equal protection, however, requires only that states "treat similarly situated people alike." Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006).  Subsection Six requires applicants who have driver's license numbers to provide their driver's license numbers.  Consistent with HAVA, it resorts to the last four digits of an applicant's Social Security number only where the applicant does not have a driver's license.  See 42 U.S.C. § 15483(a)(5)(A)(i); § 97.053(5)(a)5., Fla. Stat.  (2007).  Because they have no driver's license, such applicants are not similarly situated with applicants who can provide a driver's license number.  Equal protection does not require the Legislature to be content with the verification of only those applicants who have driver's licenses.[14]

54.  Any differential rate between different databases is justified by the interests served by verification—a process that would be less comprehensive if limited to applicants with driver's licenses.  Equal protection "does not require that the state choose ineffectual means" to achieve a valid purpose.

---

[14]  Because Subsection Six mimics HAVA by requiring a drivers' license number from those who have them and Social Security digits from those who do not, see 42 U.S.C. § 15483(a)(5)(A)(i), Plaintiffs' equal protection argument on this point would apply to equally HAVA and Subsection Six.  This Court finds that neither HAVA nor Subsection Six violates equal protection.

Rosario v. Rockefeller, 410 U.S. 752, 762 n.10 (1973).  In fact, since no two databases yield exactly identical results, Plaintiffs' reasoning would bar a state from ever using more than one database to verify a potential voter's identification information.

55.  The impact of non-verification, moreover, is equal as to all applicants, regardless of whether the applicant provided a driver's license number or the last four digits of his Social Security number.  All unverified applicants validate their numbers in the same way: by presenting their card or sending a copy to local election officials.

56.  Applicants who have no number at all (i.e., applicants who do not have a driver's license, identification card, or Social Security card) are likewise not "similarly situated" with applicants who do.  To comply with the law, such applicants would, unlike other applicants, be required to obtain a card they do not already possess.  Equal protection does not require all applicants statewide to obtain one standard card.  Indeed, this would have been incomparably more inconvenient to applicants and would have imposed greater differentials among applicants than the statute Plaintiffs attack.

57.  The Legislature is not required "to cover every evil that might conceivably have been attacked," and a "legislature traditionally has been allowed to take reform one step at a time." McDonald v. Chicago Bd. of Elec. Comm'rs, 394 U.S. 802, 809 (1969) (marks omitted).  Thus, the fact that verification does not extend to applicants without an identifying number does

not invalidate Subsection Six.

58.  Plaintiffs argue that equal protection requires Subsection Six to apply retroactively to all of Florida's 12 million registered voters.  (Doc. 135 at 22-23.) There is no support whatsoever for the idea that a new voter registration requirement is unconstitutional unless it applies retroactively to all previously registered voters.  See Woodward v. Marsh, 658 F.2d 989, 993 n.4 (5th Cir. 1981) (rejecting as "frivolous" an assertion that equal protection prevents the government from "changing its rules" or requires such changes to be applied "retroactively").[15]  The simple fact that Plaintiffs' approach would totally depopulate Florida's voter registration database and require 12 million currently registered voters to re-register demonstrates the important interests that support an exclusively prospective application.

59.  Last, Plaintiffs contend that Subsection Six, as amended, discriminates between applicants because different Supervisors have different resources and are thus differently equipped to assist applicants.  (Doc. 135 at 9-10, 23-24.) The Supervisors are independent constitutional officers funded by county governments primarily through local property taxes.  Art.  VIII, § 1(d), Fla.  Const.; Diaz, 2008 WL 793584, at *18.  Thus, as with countless public services delivered through Florida's political subdivisions—such as law enforcement and education—resource disparities are to some degree

---

[15]  In HAVA, for instance, Congress applied the identification requirement of Section 303(b) only prospectively to mail-in applicants "who register[] to vote on or after January 1, 2003." 42 U.S.C.  § 15483(d)(2)(B).

inevitable.  They are not, however, unconstitutional.

60.  In San Antonio Independent School District v. Rodriguez, 411 U.S.
1 (1973), the Supreme Court upheld a system of local funding for public
schools that created "substantial .  .  .  disparities." Id. at 15.  The Court
explained that "the Equal Protection Clause does not require absolute equality
or precisely equal advantages," id. at 24, and held that, because the
"financing system [did not] result[] in the absolute deprivation of education," it
was not unconstitutional, id. at 25; cf. Wexler v. Anderson, 452 F.3d 1226,
1233 (11th Cir. 2006) ("[L]ocal variety [in voting systems] can be justified by
concerns about cost, the potential value of innovation, and so on.").  Here,
there is no evidence of an absolute deprivation of services, and any variations
in local resources are insufficient to establish a constitutional violation.

## V. CONCLUSION

61.  Because Plaintiffs have not clearly established a substantial
likelihood of success on the merits of their constitutional claims, it is
unnecessary to address the three remaining requisites to the entry of a
preliminary injunction.  Subsection Six is justified by the state's compelling
interest in fair and honest elections.  Any obstacles to an applicant's
compliance with Subsection Six are not constitutionally cognizable
impediments to the right to vote.   The burdens imposed by Subsection
Six—the requirement that some applicants show a card they already have, in
person or otherwise—is not severe and Defendants have demonstrated that

Subsection Six does promote important regulatory state interests.

62.  Furthermore, because Subsection Six does not impose severe burdens and is supported by important regulatory interests, the differences in individual experiences with Subsection Six does not indicate a violation of the Equal Protection Clause.  Therefore, having examined Subsection Six <u>as amended</u>, and weighing the state's interest in having fair elections against any burdens on the fundamental right to vote, this Court finds that Plaintiffs have not clearly demonstrated a substantial likelihood of success on their claim that Subsection Six violates their constitutional rights.  Accordingly, it is hereby

ORDERED and ADJUDGED that Plaintiffs' Motion for Preliminary Injunction (Doc. 4) and Renewed Motion for Preliminary Injunction (Doc. 132) are hereby ***denied***.

DONE AND ORDERED this <u>twenty-fourth</u> day of June, 2008.


_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge